470 F.3d 827
 John DOE, a minor, by his mother and next friend, Jane Doe, Plaintiff-Appellant, and
Josephine Helelani Pauahi Rabago, Intervenor,
KAMEHAMEHA SCHOOLS/BERNICE PAUAHI BISHOP ESTATE; Constance H. Lau, Nainoa Thompson, Diane J. Plotts, Robert K.U. Kihune, J. Douglasing, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Defendants-Appellees.
 No. 04-15044.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted En Banc June 20, 2006.
 Filed December 5, 2006.
 
 Eric Grant, Sacramento, CA; John W. Goemans, Kamuela, Hawaii; Michael Stokes Paulsen, Minneapolis, MN, for the plaintiff-appellant.
 Kathleen M. Sullivan, Stanford, California; David Schulmeister, Cades Schutte LLP, Honolulu, HI, for the defendants-appellees.
 Patrick M.K. Richardson, McCracken, Byers & Haesloop LLP, San Mateo, CA; Mark J. Bennett, Attorney General, State of Hawaii, Girard D. Lau, Deputy Attorney General, State of Hawaii, Honolulu, HI; Alexander E. Dreier, Hogan & Hartson LLP, Washington, DC; Jeffrey N. Watanabe, Honolulu, HI; David M. Forman, Honolulu, HI; Wayne M. Pitluck, Pitluck, Kido, Stone & Aipa LLP, Honolulu, HI; Richard A. Guest, Native American Rights Fund, Washington, DC, and Carol H. Daniel, Alaskan Federation of Natives, Anchorage, AK; Carrie K.S. Okinaga, Corporation Counsel for the City and County of Honolulu, Honolulu, HI; Moses K.N. Haia III, Native Hawaiian Legal Corporation, Honolulu, HI; Clayton A. Kamida, Torkildson, Katz, Fonseca, Moore & Hetherington, Honolulu, HI; John Ishihara, Hawaii Civil Rights Commission, Honolulu, HI; Eric K. Yamamoto, Honolulu, HI, for amici curiae.
 Appeal from the United States District Court for the District of Hawaii; Alan C. Kay, District Judge, Presiding. D.C. No. CV-03-00316-ACK.
 Before MARY M. SCHROEDER, Chief Judge, and HARRY PREGERSON, STEPHEN REINHARDT, ALEX KOZINSKI, DIARMUID F. O'SCANNLAIN, PAMELA ANN RYMER, ANDREW J. KLEINFELD, SUSAN P. GRABER, WILLIAM A. FLETCHER, RICHARD A. PAEZ, MARSHA S. BERZON, RICHARD C. TALLMAN, JOHNNIE B. RAWLINSON, JAY S. BYBEE, and CONSUELO M. CALLAHAN, Circuit Judges.
 Opinion by Judge GRABER; Concurrence by Judge W. FLETCHER; Dissent by Judge BYBEE; Dissent By Judge RYMER; Dissent By Judge KLEINFELD; Dissent by Judge KOZINSKI.
 GRABER, Circuit Judge.
 
 
 1
 Plaintiff John Doe, a student who has no Hawaiian ancestry, applied for admission to Defendant Kamehameha Schools, a private, non-profit K-12 educational institution in Hawaii that receives no federal funds. He was denied entry. The Kamehameha Schools were created through a charitable testamentary trust, established by the last direct descendant of the Hawaiian monarchy, for the education and upbringing of Native Hawaiians. As a result, the Kamehameha Schools' admissions policy gives preference to students of Hawaiian ancestry. Plaintiff argues that he was denied admission because of his race in violation of 42 U.S.C. § 1981.
 
 
 2
 The majority of a three-judge panel held that the Kamehameha Schools' admissions policy, with its preference for Native Hawaiians, constituted unlawful race discrimination under 42 U.S.C. § 1981.[1] We took this case en banc to reconsider whether a Hawaiian private, non-profit K-12 school that receives no federal funds violates § 1981 by preferring Native Hawaiians in its admissions policy. We now answer "no" to that question and, accordingly, affirm the district court.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 A. Factual Background
 1. Historical Context[2]
 
 3
 The islands of Hawaii are geographically isolated in the South Pacific Ocean and were originally settled sometime between 1 and 750 A.D. The Native Hawaiians developed a well-organized, efficient, and thriving civilization "based on a communal land tenure system with a sophisticated language, culture, and religion." 20 U.S.C. § 7512. The land, abundant in natural resources, allowed the Native Hawaiians to thrive. Office of Hawaiian Affairs, Native Hawaiian Rights Handbook 3 (Melody Kapilialoha MacKenzie ed.1991) (hereinafter "Rights Handbook").
 
 
 4
 The first Western contact with the Hawaiian islands occurred in 1778 when Captain James Cook landed on the island of Kauai. The immediate result of that first encounter was that Native Hawaiians were introduced to Western goods and Western diseases. "By 1919, the Native Hawaiian population had declined from an estimated 1,000,000 in 1778 to an alarming 22,600." 20 U.S.C. § 7512(7). But see Rice v. Cayetano, 528 U.S. 495, 500, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (estimating the population in 1778 as between 200,000 and 300,000).
 
 
 5
 In 1810, Kamehameha I created a unified monarchy over all the Hawaiian Islands, becoming the first King of Hawaii and affording the islands a level of cohesion and security that they had not previously known. The United States officially recognized the sovereignty of the Kingdom of Hawaii in 1826 and, from 1843 until 1893, extended full diplomatic recognition to the islands. Other countries, too—including Great Britain, France, and Japan—recognized the Hawaiian Kingdom. 20 U.S.C. § 7512(1). Before 1893, the United States entered into a number of treaties for peace, friendship, and commerce with the Kingdom. U.S. Dep't of Justice & U.S. Dep't of the Interior, From Mauka to Makai: The River of Justice Must Flow Freely 1 (Oct. 23, 2000) (hereinafter "From Mauka to Makai"). The first treaty was signed in 1826, and additional treaties were signed in 1849, 1875, and 1887. See Rice, 528 U.S. at 504, 120 S.Ct. 1044 (discussing the history of diplomatic relations between the United States and the Kingdom of Hawaii before the overthrow of the monarchy).
 
 
 6
 The Kingdom of Hawaii, located along shipping and fishing routes, was commercially desirable. Initially, trade with the Kingdom of Hawaii revolved around the islands' fur and sandalwood resources, as well as the whaling industry. Rights Handbook at 5. When over-harvesting destroyed the sandal-wood trade and depleted the whaling stocks, wealthy Westerners turned to large-scale plantations, primarily growing sugar, to make money. Id. As foreign investment became more and more tied to land ownership, demand for change in the traditional land tenure system, which did not provide for individual land titles, intensified. Id. at 6. Pressure from Westerners eventually led the Hawaiian government to reject the land tenure system in favor of privatized land ownership, which allowed Westerners "[w]ith a permanent population of fewer than two thousand" to take "over most of Hawaii's land in the next half-century and manipulate[] the economy for their own profit." Neil M. Levy, Native Hawaiian Land Rights, 63 Cal. L.Rev. 848, 857-58 (1975) (footnote omitted).
 
 
 7
 Western economic domination of the Hawaiian Islands was followed by an interest in establishing political control. Id. at 861. "In 1893, the sovereign, independent, internationally recognized, and indigenous government of Hawaii, the Kingdom of Hawaii, was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States." 20 U.S.C. § 7512(5). The United States annexed Hawaii not long thereafter. Id. § 7512(6). Laws were then enacted suppressing the Hawaiian culture and language and allowing for the displacement of Native Hawaiians from their lands. From 1896 to 1986, almost a full century, the Hawaiian language was banned as a medium of instruction in schools. Id. § 7512(19). Hula, a Native Hawaiian dance form, and local healing practices also had been banned during the westernization of the islands. Such measures resulted in "mortality, disease, economic deprivation, social distress and population decline." From Mauka to Makai at 1.
 
 
 8
 Hawaii finally attained statehood in 1959. Rights Handbook at 18. More than 30 years later, in recognition of the United States' role in the overthrow of the independent Hawaiian monarchy, Congress officially apologized to the Hawaiian people and expressed its commitment to "provide a proper foundation for reconciliation between the United States and the Native Hawaiian people." 1993 Apology Resolution, Pub.L. No. 103-150, 107 Stat. 1510, 1513 (1993).
 
 2. The Kamehameha Schools
 
 9
 The Kamehameha Schools were created under a "charitable testamentary trust established by the last direct descendent of King Kamehameha I, Princess Bernice Pauahi Bishop, who left her property in trust for a school dedicated to the education and upbringing of Native Hawaiians." Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir.2000). Princess Bernice Pauahi Bishop's will provided for the erection and maintenance of schools in the Hawaiian Islands, called the Kamehameha Schools, on the Hawaiian monarchy's ancestral lands, with the purpose of providing "a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women." Will of Bernice Pauahi Bishop, reprinted in Wills and Deeds of Trust 17-18 (3d ed.1957) (hereinafter "Pauahi Bishop Will"). The Pauahi Bishop Will also bestowed on the "trustees full power to make all such rules and regulations as they may deem necessary for the government of said schools and to regulate the admission of pupils." Id. at 18.
 
 
 10
 Under the direction of the original trustees, chaired by Pauahi Bishop's widower, Charles Reed Bishop, the Kamehameha Schools opened in the late nineteenth century.[3] During a speech on the Schools' first Founder's Day, in December 1888, Charles Reed Bishop stated that Princess Bernice Pauahi Bishop had created the Kamehameha Schools, "in which Hawaiians have the preference," so that "her own people" could once again thrive. Charles R. Bishop, The Purpose of the Schools, Handicraft, Jan. 1889, at 3.
 
 
 11
 In 1910, not long after the death of Princess Bernice Pauahi Bishop and the creation of the Kamehameha Schools, the question arose as to who should be admitted to the Schools. Cobey Black & Kathleen Mellen, Princess Pauahi Bishop and Her Legacy 155 (The Kamehameha Schools Press 1965). Charles Bishop wrote to the trustees: "Mrs. Bishop intended that, in the advantages of her beneficence, those of her race should have preference." Id. Accordingly, he concluded that the principal of the Schools was justified in refusing to admit a student who had no native Hawaiian ancestry. Id. Bishop went on to convey that only if Native Hawaiians failed to apply to the Schools, or if conditions changed fundamentally, should admissions be opened to other ethnicities: "It was wise to prepare for and to admit natives only and I do not think the time has come to depart from that rule." Id.
 
 
 12
 Today, the Kamehameha Schools operate three K-12 campuses: Kapalama on the island of Oahu, Pukalani on the island of Maui, and Keaau on the island of Hawaii. There are about 70,000 school-aged children in Hawaii who meet the Schools' definition of Native Hawaiian, but the Schools' total enrollment is only about 4,856 students. The Kamehameha Schools subsidize much of the tuition cost for all students, requiring payment of only $1,784 per year, whereas the cost of educating a student amounts to about $20,000 annually. Sixty-five percent of those enrolled receive some form of financial aid to help them pay even that heavily subsidized, modest tuition.
 
 
 13
 Part of the Kamehameha Schools' stated admissions policy is to give preference to students of Native Hawaiian ancestry, defined to include any person descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778. Practically, the policy operates to admit students without any Hawaiian ancestry only after all qualified applicants with such ancestry have been admitted. Because there are many more qualified students of Hawaiian ancestry than there are available places at the Schools, it is very rare that a student with no Hawaiian ancestry is admitted to the campus programs. But the admissions policy is not an absolute bar to non-Native Hawaiians; instead, it is intended to last only for so long as Native Hawaiians suffer educational disadvantages.
 
 
 14
 We pause to note that the Schools' policy contains no requirement for a minimum blood quantum of Hawaiian ancestry. The only requirement is that a student have at least one Native Hawaiian ancestor. Most students have mixed ancestry. More than 60 different racial and ethnic groups have been represented in the student body, and for the 2000-2001 academic year, students reported belonging to 39 different racial and ethnic groups. Accordingly, an observer visiting the Schools would see visible diversity notwithstanding the students' commonality of having at least one Native Hawaiian ancestor.
 
 
 15
 The Kamehameha Schools follow a "Leadership Model" of education. This curriculum is meant to foster the self-esteem and self-identity of students as individuals of Native Hawaiian descent by teaching Native Hawaiian culture, heritage, language, and tradition, in addition to general college-preparatory courses.
 
 
 16
 Kamehameha Schools also operate a number of other educational programs, including pre-schools, enrichment programs, and summer school programs. In those programs, the admission of non-Native Hawaiians occurs more often. For example, for the 2001-2002 school year, 13 children with no Native Hawaiian ancestry were admitted to Kamehameha's pre-school program (two of the children declined admission); the following school year 12 non-Native Hawaiian children were admitted to the pre-school; and the year after that—the 2003-2004 school year—16 students without Native Hawaiian ancestry were admitted. And, in the summer of 2003, for instance, non-Native Hawaiians were enrolled in several of the enrichment programs run by the Kamehameha Schools: 6 of 133 students in the Performing Arts Academy; 33 of 1,741 students in Explorations; 5 of 18 students in Culinary Arts; and 4 of 164 students in Hoolauna Keauhou.
 
 
 17
 3. Current Conditions in the Educational Status of Native Hawaiians
 
 
 18
 Although the Kamehameha Schools are partly responsible for the Native Hawaiian community's ability to maintain "its distinct character as an aboriginal, native people," Native Hawaiians, nonetheless, continue to face "economic deprivation, low educational attainment, poor health status, substandard housing and social dislocation." From Mauka to Makai at 2. In particular, Native Hawaiians have traditionally performed much below national averages in the educational arena.
 
 
 19
 In 1981, Congress instructed the Office of Education to submit to Congress a comprehensive report on Native Hawaiian education. The report, entitled the "Native Hawaiian Educational Assessment Project," was released in 1983 and documented that Native Hawaiians scored below parity with regard to national norms on standardized achievement tests, were disproportionately represented in many negative social and physical statistics indicative of special educational needs, and had educational needs that were related to their unique cultural situation, such as different learning styles and low self-image.
 
 
 20
 20 U.S.C. § 7512(14).
 
 
 21
 That trend continues today. In 2002, Congress recognized that Native Hawaiians are severely disadvantaged in education. It found that:
 
 
 22
 (A) educational risk factors continue to start even before birth from many Native Hawaiian children[;]
 
 
 23
 . . .
 
 
 24
 (B) Native Hawaiian students continue to begin their school experience lagging behind other students in terms of readiness factors such as vocabulary test scores;
 
 
 25
 (C) Native Hawaiian students continue to score below national norms on standardized education achievement tests at all grade levels;
 
 
 26
 (D) both public and private schools continue to show a pattern of lower percentages of Native Hawaiian students in the uppermost achievement levels and in gifted and talented programs;
 
 
 27
 (E) Native Hawaiian students continue to be over-represented among students qualifying for special education programs provided to students with learning disabilities, mild mental retardation, emotional impairment, and other such disabilities;
 
 
 28
 (F) Native Hawaiians continue to be underrepresented in institutions of higher education and among adults who have completed four or more years of college;
 
 
 29
 (G) Native Hawaiians continue to be disproportionately represented in many negative social and physical statistics indicative of special educational needs[;] . . .
 
 
 30
 . . . and
 
 
 31
 (H) Native Hawaiians now comprise over 23 percent of the students served by the State of Hawaii Department of Education, and there are and will continue to be geographically rural, isolated areas with a high Native Hawaiian population density.
 
 
 32
 20 U.S.C. § 7512(16)(A)-(H).
 
 
 33
 In addition, the most recent Native Hawaiian Educational Assessment, published in September 2005, concluded that, "[o]n the whole, . . . Native Hawaiian children in the public school system perform poorly in school compared with their non-Hawaiian peers." Ka Huakai, 2005 Native Hawaiian Educational Assessment 229, available at http://ulukau.org/ elib/cgi-bin/library?c=nhea & l=en (hereinafter "Ka Huakai"). That most recent report found that 75% of public schools with a predominantly Native Hawaiian student body did not meet the state's adequate yearly progress standards, but that number dropped to less than 58% for schools without a majority of Native Hawaiians, a difference of more than 17%. Id. at 251. Also, Native Hawaiian students in elementary and secondary public schools ranked the lowest of all major ethnic groups throughout the state in reading and math, falling between 9 and 15 percentiles behind the state average. Id. at 261, 268. In addition, only 69.4% of Native Hawaiian students graduated from high school in 2002, compared to a state average of 76.6% overall. Id. at 285.[4]
 
 B. Procedural History
 
 34
 Plaintiff applied for admission to the Kamehameha Schools. He has no Hawaiian ancestry. Although the school deemed him a "competitive applicant" and put him on the waiting list, he was repeatedly denied admission. The Kamehameha Schools concede that Plaintiff likely would have been admitted had he possessed Hawaiian ancestry.
 
 
 35
 Plaintiff filed an action under 42 U.S.C. § 1981, challenging the Kamehameha Schools' admissions policy. He sought both damages and injunctive relief.[5] The district court granted summary judgment in favor of the Kamehameha Schools, holding that the policy satisfied a variation of the standard used to evaluate affirmative action plans challenged under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000h-6:
 
 
 36
 The Court finds the plan has a legitimate justification and serves a legitimate remedial purpose by addressing the socioeconomic and educational disadvantages facing Native Hawaiians, producing Native Hawaiian leadership for community involvement, and revitalizing Native Hawaiian culture, thereby remedying current manifest imbalances resulting from the influx of western civilization.
 
 
 37
 Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 295 F.Supp.2d 1141, 1172 (D.Haw.2003). The district court also held that application of § 1981 to the admissions policy should be consistent with other congressional enactments involving Native Hawaiians. Id. at 1174. Plaintiff timely appealed.
 
 
 38
 The majority of a three-judge panel reversed the district court. Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 416 F.3d 1025, 1048 (9th Cir.2005). The panel concluded that the Title VII framework applied, id. at 1038-39, but the majority held that the Kamehameha Schools' preference policy violated § 1981 because it "operates as an absolute bar to admission for non-Hawaiians," id. at 1041. We then took the case en banc.[6] Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate, 441 F.3d 1029 (9th Cir. 2006).
 
 STANDARD OF REVIEW
 
 39
 The parties, and we, agree that we review de novo a grant of summary judgment. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). But the parties dispute vigorously what standard we should use to analyze the validity of the Kamehameha Schools' admissions policy.
 
 
 40
 Plaintiff argues that the Schools' policy should be evaluated under the "strict scrutiny" standard that applies to governmental action involving race-based preferences. The Schools counter that we should employ the more deferential Title VII test for evaluating affirmative action plans, with variations appropriate to the educational context. For the reasons that we detail below, we agree with the Schools.
 
 DISCUSSION
 A. History of § 1981, Runyon, and McDonald
 
 41
 Title 42 U.S.C. § 1981 provides, in pertinent part, that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The genesis of the current statute was the Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (hereinafter "1866 Act"), which Congress enacted pursuant to the Thirteenth Amendment.[7] Under its authority to enact laws to abolish the "badges and incidents of slavery," United States v. Stanley (Civil Rights Cases), 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883), Congress intended for the 1866 Act to counter the explicit discrimination faced by the recently freed slaves. See Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 386-88, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) ("Congress instead acted to protect the freedmen from intentional discrimination by those whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices." (internal quotation marks omitted)).
 
 
 42
 After the passage of the Fourteenth Amendment, Congress reenacted, with minor changes, the text of the 1866 Act in section 16 of the Enforcement Act of 1870, ch. 114, § 16, 16 Stat. 140 (hereinafter "1870 Act").[8] See Runyon v. McCrary, 427 U.S. 160, 169 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (describing the history of § 1981 and noting that section 16 of the 1870 Act was "merely a re-enactment," with some small changes, of the 1866 Act). Accordingly, § 1981 has "roots" in both the Thirteenth and the Fourteenth Amendments. Gen. Bldg. Contractors, 458 U.S. at 390 n. 17, 102 S.Ct. 3141. But the "events and passions of the time in which the law was forged" make clear that the purpose of § 1981 was to destroy the societal influences that were intended to keep former slaves from achieving parity with former masters. Id. at 386, 102 S.Ct. 3141 (internal quotation marks omitted).
 
 
 43
 Section 1981 largely lay dormant for nearly a century when, in 1976, the Supreme Court reinvigorated the statute in Runyon. In Runyon, the Supreme Court faced the question whether § 1981 prevents "private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes," 427 U.S. at 168, 96 S.Ct. 2586, and held that it does, id. at 172-73, 96 S.Ct. 2586.[9] The parents of African-American children had sought to enter into contractual relationships with the schools. "Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." Id. at 172, 96 S.Ct. 2586. The schools' refusal to admit them therefore "amount[ed] to a classic violation of § 1981." Id. The Court noted that Congress had the right to reach private acts of discrimination in the private school setting because of its power under the Thirteenth Amendment to enact legislation to combat racial discrimination. Id. at 170-71. Runyon, then, involved a straightforward case of discrimination, not a remedial policy.
 
 
 44
 On the same day as it issued Runyon, the Court decided that § 1981, notwithstanding its text, prohibits discrimination against white people, as well as against non-whites. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 296, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
 
 
 45
 In neither case did the Court have occasion to consider whether and under what terms (i.e., under what standard of scrutiny) a private remedial racial preference would be permissible in the educational context under § 1981, nor has it since. But in considering the reach of § 1981, the Supreme Court has looked, in different ways, to both the Fourteenth Amendment and Title VII for guidance.
 
 
 46
 B. Application of Title VII Standards to § 1981 Claims
 
 
 47
 In General Building Contractors, the Court limited § 1981 to cover only acts involving intentional discrimination, excluding from the statute's reach actions that merely have a disparate effect. 458 U.S. at 391, 102 S.Ct. 3141. In so doing, the Court relied on the fact that § 1981 traces its history, in part, to the Fourteenth Amendment and, accordingly, to the Equal Protection Clause. Id. at 390-91, 102 S.Ct. 3141. Even though the Supreme Court imported the purposeful discrimination element of its equal protection jurisprudence to § 1981, later Supreme Court precedent regarding § 1981 and Title VII suggests that the "strict scrutiny" standard of equal protection does not apply to a wholly private school's race-based remedial admissions plan.
 
 
 48
 In Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), superseded by statute on other grounds as stated in Estate of Reynolds v. Martin, 985 F.2d 470, 475 n. 2 (9th Cir.1993), the Supreme Court signaled its intention to apply the Title VII analysis to § 1981 claims brought against a private employer. In Patterson, the plaintiff brought a § 1981 suit against her former employer, alleging that the employer had harassed her, failed to promote her, and fired her on account of her race. 491 U.S. at 169, 109 S.Ct. 2363. The Court analyzed the ways in which § 1981 and Title VII overlap, as well as the statutes' differences, and concluded that the Title VII burden-shifting system of proof established in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applied to the case at hand. Patterson, 491 U.S. at 186, 109 S.Ct. 2363. That is, the plaintiff first must establish a prima facie case of discrimination by coming forward with evidence that an employer considered race in its employment decisions. Id.; Johnson v. Transp. Agency, 480 U.S. 616, 626, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). After a prima facie case is established, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the decision. Patterson, 491 U.S. at 187, 109 S.Ct. 2363. "The existence of an affirmative action plan provides such a rationale." Johnson, 480 U.S. at 626, 107 S.Ct. 1442. If a relevant affirmative action plan exists, then the burden shifts back to the plaintiff to show that the justification provided was pretextual and that the plan is invalid. Id.
 
 
 49
 Several courts expressly have applied Title VII's substantive standards when examining § 1981 challenges to private affirmative action plans. The leading case, on which all the others rely, is Setser v. Novack Investment Co., 657 F.2d 962 (8th Cir.1981) (en banc). In Setser, the plaintiff, a white man, sued Novack under § 1981 claiming that he had been refused employment on account of his race because of an affirmative action plan. Setser v. Novack Inv. Co., 638 F.2d 1137, 1139 & n. 3 (8th Cir.1981), opinion vacated in part on reh'g by Setser, 657 F.2d at 962. The Setser court addressed two issues that are relevant here: "(1) whether section 1981 prohibits all race-conscious affirmative action; [and] (2) whether the standards for reviewing affirmative action under [T]itle VII govern the review of such plans under section 1981." 657 F.2d at 965.
 
 
 50
 The Eighth Circuit first concluded that § 1981 does not bar affirmative action programs, even in light of McDonald, 427 U.S. at 296, 96 S.Ct. 2574, which held that § 1981 affords protection to white people. In so holding, the Setser court looked to the Supreme Court's decision in United Steelworkers of Am. v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), which held that Title VII does not bar all preferential treatment on the basis of race, and applied the same rationale to § 1981:
 
 
 51
 It would indeed be . . . ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminatory employment practices against blacks and other minorities, when the Act was virtually useless to prevent the occurrence of such discrimination for more than a century.... We conclude that the Supreme Court, by approving race-conscious affirmative action by employers in Weber, implicitly approved the use of race-conscious plans to remedy past discrimination under section 1981. To open the door for such plans under [T]itle VII and close it under section 1981 would make little sense. The prohibition under section 1981 of affirmative action plans permissible under [T]itle VII would bar a remedy Congress left within the discretion of private employers when it passed [T]itle VII.
 
 
 52
 Setser, 657 F.2d at 966-67 (emphasis added).
 
 
 53
 Having determined that affirmative action plans were permissible, the Setser court expressly "equat[ed] the affirmative action standards of [T]itle VII with those of section 1981." Id. at 967. The court did so in view of the general principle that, "[i]n fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under [T]itle VII for direction." Id. (internal quotation marks omitted). This principle of consistency was especially important to the Setser court because it found untenable the prospect that an employer could be ordered, under Title VII, to implement an affirmative action plan, but simultaneously barred from implementing that same plan under § 1981, if the two statutes were interpreted differently. Id. at 967-68.
 
 
 54
 The Third Circuit in a recent decision, as well as other courts, have followed Setser in using Title VII standards to evaluate private affirmative action plans challenged under § 1981. See, e.g., Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498-99 (3d Cir.1999); Edmonson v. U.S. Steel Corp., 659 F.2d 582, 584 (5th Cir.1981) (per curiam); Frost v. Chrysler Motor Corp., 826 F.Supp. 1290, 1294 (W.D.Okla.1993); Stock v. Universal Foods Corp., 817 F.Supp. 1300, 1306 (D.Md.1993); see also Johnson v. Transp. Agency, 770 F.2d 752, 755 n. 2 (9th Cir.1985) (noting, with approval, the Setser analysis), aff'd, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).
 
 
 55
 The Supreme Court's recent University of Michigan cases—Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003)—do not counsel a different result. In those cases, the Supreme Court strictly scrutinized the admissions policies of a public university, the University of Michigan Law School and its undergraduate counterpart. See Grutter, 539 U.S. at 326, 123 S.Ct. 2325 (law school); Gratz, 539 U.S. at 270, 123 S.Ct. 2411 (undergraduate institution). Plaintiff places great stock in the fact that in both cases, the Supreme Court mentioned § 1981 in conjunction with the plaintiff's Equal Protection Clause claim. See Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (noting that, because the law school's admissions policy satisfied strict scrutiny review under the Equal Protection Clause, it also satisfied § 1981); Gratz, 539 U.S. at 275-76 & n. 23, 123 S.Ct. 2411 (noting that, because the university's undergraduate admissions program failed strict scrutiny under the Equal Protection Clause, it also violated § 1981).
 
 
 56
 To support both of its holdings, the Court cited General Building Contractors for the proposition that discrimination that violates the Equal Protection Clause also violates § 1981. See Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (noting that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"); Gratz, 539 U.S. at 276 n. 23, 123 S.Ct. 2411 ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981."). As explained earlier, in General Building Contractors, the Court held that § 1981, like the Equal Protection Clause, prohibits only purposeful discrimination and therefore does not permit claims of disparate impact. 458 U.S. at 389, 102 S.Ct. 3141. Read in context, we believe that the Supreme Court's citation to General Building Contractors in the University of Michigan cases was meant to signal only the fact that both § 1981 and the Fourteenth Amendment require intentional discrimination. Whether strict scrutiny applies to § 1981 claims was not at issue. In Grutter and Gratz, cases involving state action, the schools perforce did not argue that their programs satisfied § 1981. The Court in Grutter and Gratz simply did not consider the question.
 
 
 57
 In view of the precedents that we have just discussed, we conclude that Title VII principles apply here. Defendant is a purely private entity that receives no federal funds. The Supreme Court has never applied strict scrutiny to the actions of a purely private entity. The question remains how best to adapt the Title VII employment framework to an educational context and to the unique historical circumstances of this case.
 
 
 58
 C. Applying a Modified Title VII Standard in the Educational Context Under § 1981
 
 
 59
 Only step three of the traditional three-stage Title VII analysis, Patterson, 491 U.S. at 187, 109 S.Ct. 2363; Johnson, 480 U.S. at 626, 107 S.Ct. 1442, is at issue here. At step one, Plaintiff established a prima facie case by showing (as the Schools concede) that the Kamehameha Schools consider applicants' Hawaiian ancestry, or lack thereof, in making admissions decisions. At step two, the Kamehameha Schools have specified their remedial admissions policy as the non-discriminatory rationale for their decisions. See Johnson, 480 U.S. at 626, 107 S.Ct. 1442 (holding that an affirmative action plan provides a legitimate reason for a hiring decision that considers race or ethnicity). The validity of this policy is the focus of the parties' attentions in this case. That is, at step three, Plaintiff asserts that the Schools' "justification is pretextual and the [admissions] plan is invalid." Id. The burden of proof at this step lies with Plaintiff. Id. at 627, 107 S.Ct. 1442.
 
 
 60
 The Supreme Court has outlined the appropriate step-three Title VII inquiry in the context of private employment. In Weber, the Court held for the first time that Title VII does not prevent private employers from implementing voluntary, remedial affirmative action plans. 443 U.S. at 208, 99 S.Ct. 2721. Weber involved an employer that had established a training program and reserved 50% of the program's openings for black employees until the percentage of black workers in its plant reached the percentage of black workers in the local labor force. Id. at 197, 99 S.Ct. 2721. In concluding that the plan was permissible under Title VII, the Court noted that the plan did not "unnecessarily trammel the interests of the white employees" or "create an absolute bar to the[ir] advancement." Id. at 208, 99 S.Ct. 2721. The Court based its decision in part on the fact that the plan was a "temporary measure": "Preferential selection ... will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force." Id. at 208-09, 99 S.Ct. 2721. The Court declined to "define in detail the line of demarcation between permissible and impermissible affirmative action plans." Id. at 208, 99 S.Ct. 2721; see also Johnson, 770 F.2d at 757 (noting that the Supreme Court had not "establish[ed] a rigid formula for testing the validity of an affirmative action plan"), aff'd, 480 U.S. at 641, 107 S.Ct. 1442.
 
 
 61
 Eight years later, in Johnson, the Court concluded that a county-agency employer did not violate Title VII by taking into consideration the sex of a female employee in deciding to promote her instead of a male employee. The promotional policy, which took into consideration the sex and race of an applicant, was valid because it attempted to eliminate a "manifest imbalance" in a "traditionally segregated job categor[y]." Johnson, 480 U.S. at 631, 107 S.Ct. 1442 (internal quotation marks omitted). Like Weber, Johnson also considered whether the plan unnecessarily trammeled the rights of the non-preferred class, in this case men, or created an absolute bar to their advancement. Id. at 637-38, 107 S.Ct. 1442. Finally, the Court considered whether the plan was "temporary," designed to "attain a balanced work force, not to maintain one." Id. at 639-40, 107 S.Ct. 1442.
 
 
 62
 We recently distilled the Court's analysis this way: private employers' affirmative action plans (1) must respond to a manifest imbalance in the work force; (2) must not "unnecessarily trammel[ ]" the rights of members of the non-preferred class or "create an absolute bar to their advancement"; and (3) must do no more than is necessary to attain a balance. Rudebusch v. Hughes, 313 F.3d 506, 520-21 (9th Cir.2002). In Rudebusch, we found that the pay equity plan at issue was "not wholly analogous" to the hiring and promotional plans at issue in Weber and Johnson because of "some significant conceptual differences" between the types of plans. Id. at 520. We nevertheless applied the three Johnson factors, taking account of "the context of our case." Id. at 521. Similarly, we hold today that the Johnson factors, modified to fit "the context of our case," provide the appropriate frame-work for determining whether a wholly private K-12 educational institution's remedial admissions policy is valid.
 
 
 63
 We note that, when assessing the validity of affirmative action plans, the Supreme Court has consistently recognized the importance of deferring to the judgment and expertise of the relevant decisionmakers. See Grutter, 539 U.S. at 328, 123 S.Ct. 2325 (deferring to education officials in admissions decisions); Weber, 443 U.S. at 206, 99 S.Ct. 2721 (giving deference to employers in hiring decisions). In the employment context, the Supreme Court held that, in enacting Title VII, Congress wished to preserve, to the maximum extent possible, the freedom and discretion traditionally afforded to private businesses. Weber, 443 U.S. at 206-07, 99 S.Ct. 2721. In the educational context, the Court has underscored that "complex educational judgments" should be left largely to schools. Grutter, 539 U.S. at 328, 123 S.Ct. 2325; see also Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (noting that "[a]cademic freedom thrives . . . on autonomous decisionmaking by the academy itself" (citations omitted)). The importance of "educational autonomy"—at least in the post-secondary environment—is rooted in the First Amendment. See Grutter, 539 U.S. at 329, 123 S.Ct. 2325 ("[G]iven . . . the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) ("Academic freedom . . . long has been viewed as a special concern of the First Amendment."). Consequently, we must accord deference to private educational decisionmakers just as we do to private business decisionmakers and public educational decisionmakers.
 
 
 64
 More importantly, schools perform a significantly broader function than do employers. The Supreme Court has long recognized that schools do more than simply teach our Nation's children the three "R's." Schools play a special role in the development of young citizens. See Grutter, 539 U.S. at 331, 123 S.Ct. 2325 ("We have repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to sustaining our political and cultural heritage with a fundamental role in maintaining the fabric of society." (internal quotation marks omitted)); Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("[E]ducation . . . is the very foundation of good citizenship."). Educational opportunity is crucial to the development of tomorrow's leaders. See Grutter, 539 U.S. at 332, 123 S.Ct. 2325 ("In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.").
 
 
 65
 Primary and secondary school education is the gateway to higher education and is of paramount importance for the training of our nation's workforce. See Plyler v. Doe, 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all."); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 437, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (Blackmun, J., concurring) ("Our cases have consistently recognized the importance of education to the professional and personal development of the individual."). Perhaps more relevant here, increased primary and secondary school educational achievement by minority groups can obviate the downstream need for affirmative action programs by employers and institutions of higher learning. See Johnson, 480 U.S. at 635, 107 S.Ct. 1442 (noting that very limited numbers of women and minorities possess the "specialized training and experience" required for many categories of jobs); Grutter, 539 U.S. at 346, 123 S.Ct. 2325 (Ginsburg, J., concurring) (noting that the need for affirmative action programs in higher education will decrease "[a]s lower school education in minority communities improves").
 
 
 66
 In sum, schools educate students for their future endeavors in society as a whole. While private employers strive primarily to make money, and public employers (such as police and fire departments) perform a specific public function, schools pursue a much broader mission: the development of all children to become citizens, leaders, and workers.
 
 
 67
 The Title VII cases, in the employment context, recognize the laudable goal of achieving diversity and proportional representation in the workplace; this goal necessarily focuses internally and is limited to the "employer's work force." Johnson, 480 U.S. at 632, 107 S.Ct. 1442. By contrast, ensuring that significantly underachieving minority groups are included fully as tomorrow's citizens, leaders, and workers necessarily focuses externally. Considering this important difference, we conclude that we should use a standard for evaluating remedial racial preferences by wholly private primary and secondary schools that is akin to that used in Title VII employment cases, but that takes into account the inherently broad and societal focus of the educational endeavor.
 
 
 68
 Adjusting the first Johnson factor to account for this external focus, we hold that, to justify a remedial racial preference, a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population. The external focus of the educational mission renders unnecessary the requirement of proof of a "manifest imbalance" within a particular school; the relevant population is the community as a whole. At the same time, the strict focus on present, demonstrable disparities in educational achievement limits the types of permissible programs and distinguishes a more amorphous program that relies solely on general past societal discrimination. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505-06, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).
 
 
 69
 Relatedly, the second Johnson factor must be modified to account for the relevant scope of inquiry. Just as imbalance should be viewed in the relevant community, rather than in a single school, so should the respective rights of members of the non-preferred group. Therefore, within the community as a whole, an admissions policy must not "unnecessarily trammel" the rights of students in the non-preferred class or "create an absolute bar" to their advancement. The third Johnson factor is similarly modified: an admissions policy must do no more than is necessary to remedy the imbalance in the community as a whole, that we identified at the first step. These three factors best harmonize the relevant statutes and Supreme Court cases.
 
 
 70
 Judge Bybee's reliance on Runyon in attacking our conclusion is particularly misplaced. As his dissent quotes several times, diss. at 857, 858, 860, the Supreme Court in Runyon held that private primary schools in Virginia that categorically denied admission to African-American applicants represented a "classic violation of § 1981." Runyon, 427 U.S. at 172, 96 S.Ct. 2586. Nothing in the modified Johnson framework that we adopt today, or indeed anywhere in this opinion, is to the contrary. Quite simply, Runyon is inapposite: The program at issue in Runyon would certainly fail the first step of our analysis because specific, significant imbalances did not exist favoring African-Americans. To the contrary, specific, significant imbalances did exist disfavoring African-Americans. The Civil Rights Act was passed specifically with the plight of African-Americans in mind. It is therefore unsurprising that the Court labeled a whites-only admissions policy a "classic violation of § 1981."
 
 
 71
 By contrast, the very nature of affirmative action plans is that historically disfavored and underachieving minorities may be given preferential treatment in certain narrowly defined, limited programs. It is the contours of such a program—a private school's voluntary remedial admissions program—that we explore today. We turn now to applying the three modified Johnson factors to the Kamehameha Schools' admissions policy.
 
 1. Respond to a Manifest Imbalance
 
 72
 To meet the first modified Johnson factor, a private school must demonstrate that, in the relevant community, specific, significant imbalances in educational achievement presently affect the group favored by its admissions policy. The relevant community in this case is the state of Hawaii, because the Schools serve students from all of Hawaii's islands. We therefore consider whether a manifest imbalance in current educational achievement exists between Native Hawaiians and other ethnic groups in Hawaii.
 
 
 73
 Native Hawaiian students are systemically disadvantaged in the classroom. As we described earlier, there is a substantial disparity in performance between Native Hawaiian students and other ethnic groups. Briefly, Native Hawaiian students score lower on standardized tests than all other ethnic groups in the state, Ka Huakai at 229, 261, are more likely to be in special education classes, id. at 278, are more likely to be absent from school, id. at 229, and are more likely to attend poor-quality schools, id. at 252. Native Hawaiians are the least likely of the state's major ethnic groups to graduate from high school, id. at 229, 285, and they are less likely than their non-Hawaiian counterparts to attend college, id. at 118-19. Congress has expressly recognized the educational disadvantages suffered by Native Hawaiians and their marginalized status. 20 U.S.C. § 7512.
 
 
 74
 In view of those facts and congressional findings, it is clear that a manifest imbalance exists in the K-12 educational arena in the state of Hawaii, with Native Hawaiians falling at the bottom of the spectrum in almost all areas of educational progress and success.
 
 
 75
 Furthermore, it is precisely this manifest imbalance that the Kamehameha Schools' admissions policy seeks to address. The goal is to bring Native Hawaiian students into educational parity with other ethnic groups in Hawaii. The stated purpose of Kamehameha Schools is to create educational opportunities to improve the capability and well-being of Native Hawaiians and to cultivate, nurture, and perpetuate Hawaiian culture, values, history, and language.
 
 
 76
 To that end, the Schools advance a curriculum specially tailored to students of Native Hawaiian descent. The Schools have pinpointed areas in which Native Hawaiians, in particular, are severely disadvantaged and have developed a curriculum to attend to those needs. The Schools have instituted a "Leadership Model" of education, meant to "restore self-identity, integrate Native Hawaiian culture, heritage, language, and traditions into the educational process, and provide a first-rate educational experience for Native Hawaiians." The Schools' efforts are aimed at increasing scores on standardized tests, increasing the number of Native Hawaiians attending colleges and graduate schools, improving Native Hawaiian representation in professional, academic, and managerial positions, and developing community leaders who are committed to improving the lives of all Native Hawaiians.
 
 
 77
 In addition, the Kamehameha Schools recognized, early on, a critical need to help perpetuate Native Hawaiian culture. As a result, in the 1940s, the Schools instituted a formal Hawaiian Cultural Program that continues today. Courses on Hawaiian history and culture are required before a student may graduate.
 
 
 78
 The Kamehameha Schools have shown that specific, significant imbalances in educational achievement currently affect Native Hawaiians in Hawaii and that the Schools aim to remedy that imbalance. Accordingly, they have satisfied the "manifest imbalance" criterion.
 
 
 79
 2. Do Not Unnecessarily Trammel the Rights of Members of the Non-Preferred Class or Create an Absolute Bar to Their Advancement
 
 
 80
 Under the second prong of the modified Title VII analysis, we ask whether, within the relevant community of Hawaii, the Kamehameha Schools' admissions policy unnecessarily trammels the rights of members of the non-preferred class, that is, students with no Hawaiian ancestry, or creates an absolute bar to their advancement.
 
 
 81
 The Kamehameha Schools allow all students to apply for admission. But once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry. Because the pool of qualified potential students with Native Hawaiian blood greatly outnumbers the available slots at the Schools, non-Native Hawaiians generally are not admitted.[10] For the reasons that follow, however, the Schools' admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.
 
 
 82
 We begin by noting that nothing in the record suggests that educational opportunities in Hawaii are deficient for students, like Plaintiff, who lack any Native Hawaiian ancestry. To the contrary, the same statistical data that portray the difficulties of Native Hawaiian children generally portray much greater educational achievement, in both public and private primary and secondary schools, for children of all other racial and ethnic groups in Hawaii. Those students denied admission by Kamehameha Schools have ample and adequate alternative educational options. The well-documented ability of non-Native Hawaiians to attain educational achievement in Hawaii notwithstanding the Kamehameha Schools' longstanding admissions policy demonstrates that the policy neither unnecessarily trammels the rights of non-Native Hawaiians nor absolutely bars their advancement in the relevant community.
 
 
 83
 Our inquiry does not stop there, however. The history of Native Hawaiians and of the Kamehameha Schools has certain unique features that Congress has acknowledged. In 1993, Congress admitted that the United States was responsible, in part, for the overthrow of the Hawaiian monarchy. 1993 Apology Resolution, 107 Stat. 1510. Later, when it enacted education-related legislation in 1994, and then reenacted that legislation in 2002, Congress made findings regarding the disadvantages faced by Native Hawaiian students in the public school system in Hawaii. 20 U.S.C. §§ 7901-7941, 7512(16). As part of the 2002 reenactment, a congressional committee even urged the Bishop Trust, which operates the Kamehameha Schools, to "redouble its efforts to educate Native Hawaiian children." H.R.Rep. No. 107-63(I), at 333 (2001) (emphasis added).
 
 
 84
 Congressional recognition of the challenges faced by Native Hawaiians in the educational arena supports our conclusion that the Schools' policy does not unnecessarily trammel the rights of non-Native Hawaiians. To the contrary, as Congress has recognized, in the unique context of Native Hawaiian history, affirmative measures are needed to address present, severe inequalities in educational achievement.
 
 
 85
 Finally, we examine the expectations of those who lack Native Hawaiian ancestry. The Supreme Court observed in Johnson that "the denial of the promotion[at issue] unsettled no legitimate, firmly rooted expectation on the part of petitioner." 480 U.S. at 638, 107 S.Ct. 1442. Similarly, here, we must ask whether Plaintiff had a legitimate, firmly rooted expectation of admission to the Schools. The answer is "no."
 
 
 86
 No applicant to the Kamehameha Schools is guaranteed admission. Just as the applicant in Johnson "had no absolute entitlement" to the promotion from his employer, Plaintiff here likewise "had no absolute entitlement" to admission to the Schools. Id.
 
 
 87
 Furthermore, the Kamehameha Schools were established when Hawaii was a sovereign nation, and they were built on the Hawaiian monarchy's land. When the Schools began, a non-Native Hawaiian had no expectation of admission to the Schools, except when Native Hawaiians failed to fill all the available slots, or until Native Hawaiians achieved educational parity with others. See supra p. 832. In the intervening 118 years, the Schools' admissions policy, and therefore the expectations of the non-Native Hawaiians, has remained constant. Thus, denial of Plaintiff's application for admission "unsettled no legitimate, firmly rooted expectation." Johnson, 480 U.S. at 638, 107 S.Ct. 1442.
 
 
 88
 For the foregoing reasons, the Kamehameha Schools' admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.
 
 3. Do No More than Is Necessary
 
 89
 Finally, the Schools' admissions policy must do no more than is necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry. This factor requires that an affirmative action plan be "temporary." Johnson, 480 U.S. at 640, 107 S.Ct. 1442; Weber, 443 U.S. at 208, 99 S.Ct. 2721.
 
 
 90
 The Kamehameha Schools' decision to give preference to students with Native Hawaiian ancestry is limited in duration in two distinct ways. First, if qualified students with Native Hawaiian ancestry do not apply to the Schools in sufficient numbers to fill the spots available, as happened in one recent year, see supra note 10, the Schools' policy is to open admissions to any qualified candidate. Second, preference will be given to students with Native Hawaiian ancestry only for so long as is necessary to remedy the current educational effects of past, private and government-sponsored discrimination and of social and economic deprivation. These dual aspects of the Kamehameha Schools' policy constitute an "[e]xpress assurance that a program is only temporary." Johnson, 480 U.S. at 639-40, 107 S.Ct. 1442. An explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid. See, e.g., id. at 639, 107 S.Ct. 1442 (finding the lack of an "explicit end date" "unsurprising" and upholding an employer's affirmative action plan even though "only gradual" improvements were anticipated); see also Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (adopting Justice Powell's reasoning in the 25-year-old Bakke decision, which upheld affirmative action programs in higher education, and expecting that in 25 more years, these programs "will no longer be necessary"—a span of 50 years).
 
 
 91
 Because the admissions policy is not fixed, but changes as the capacity of the Schools' programs increases and as the well-being of the Native Hawaiian community rises, the policy does no more than is necessary in light of the significant educational imbalances that Native Hawaiians continue to face.
 
 
 92
 Accordingly, the Kamehameha Schools' admissions policy satisfies the three Johnson criteria—offset a manifest imbalance, do not unnecessarily trammel others' rights or create an absolute bar, and do no more than is necessary—as modified for the private primary and secondary school context. The Schools have shown that the admissions policy, favoring students of Native Hawaiian descent, is legitimate and valid.
 
 
 93
 Judge Bybee's dissent contends that we should hew more closely to a traditional Title VII analysis and that, under such an analysis, the Schools' preferential admissions policy is not valid. (Bybee, J., diss. at 857-85.) For the reasons that we have detailed, we believe that the dissent's focus is too narrow for the private school context and that Kamehameha Schools' remedial admissions policy is legitimate in the face of the serious and systemic disadvantages faced by Native Hawaiian students in Hawaii today. See Johnson, 480 U.S. at 640, 107 S.Ct. 1442 ("In evaluating the compliance of an affirmative action plan with Title VII's prohibition on discrimination, we must be mindful of this Court's and Congress' consistent emphasis on the value of voluntary efforts to further the objectives of the law." (internal quotation marks omitted)); see also Rudebusch, 313 F.3d at 522-24 (revising the third Johnson factor to analyze quantitative rather than temporal limitations because of the context).
 
 
 94
 Even if we were to try to shove a square peg into a round hole by strictly applying the test developed in employment cases to the Kamehameha Schools' admissions policy, that policy would still be valid. As the Supreme Court has cautioned, "[i]t is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." Weber, 443 U.S. at 201, 99 S.Ct. 2721 (internal quotation marks omitted). The Kamehameha Schools' admissions policy holds true to the spirit of § 1981 by supporting Native Hawaiian students so that they may attain parity with their non-Native Hawaiian peers. See Gen. Bldg. Contractors, 458 U.S. at 386, 102 S.Ct. 3141.
 
 
 95
 D. Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted § 1981.
 
 
 96
 Plaintiff brought suit under § 1981. He has brought no constitutional claims. Thus, we are charged only with determining Congress' intent.
 
 
 97
 Congress originally enacted what later became 42 U.S.C. § 1981 in 1870. At that time, the statute did not apply in Hawaii because it was an independent, sovereign kingdom. Congress could not have had any conscious intention as to how the statute would apply in Hawaii, because it did not apply at all. When Hawaii became a territory in 1898, § 1981 applied, as it continued to do when Hawaii became a state in 1959, see Hawaiian Statehood Act, Pub.L. No. 86-3, § 15, 73 Stat. 4.11 (1959), but it was not until 1991 that Congress again addressed and amended § 1981, see Civil Rights Act of 1991, Pub.L. No. 102-166, § 101, 105 Stat. 1071. The 1991 amendments are the most recent, and indeed the only, time since Hawaii became a territory that Congress has reenacted § 1981.
 
 
 98
 Therefore, we must determine what Congress intended, with regard to Native Hawaiians, when it reenacted § 1981 in 1991. Because "[w]e assume that Congress is aware of existing law when it passes legislation," Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), we must consider Congress' long history of providing for Native Hawaiians through legislation. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (noting that courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts"). By construing § 1981 in the context of past congressional action that recognizes and provides for Native Hawaiians, we preserve the "sense and purpose" of all relevant statutes. See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (noting that it is the duty of the courts to give effect to differing and conflicting statutes so as to preserve their "sense and purpose"). Importantly, the Supreme Court has expressly considered contemporaneous legislation when interpreting the scope of § 1981. In Runyon, for instance, the Court relied on Congress' enactment of the Civil Rights Act of 1964 and other civil rights legislation in concluding that Congress must have intended § 1981 to reach private acts of discrimination. 427 U.S. at 174, 96 S.Ct. 2586; see also Weber, 443 U.S. at 201, 99 S.Ct. 2721 (noting that the application of Title VII to remedial affirmative action plans must be read in light of its legislative history and "the historical context from which the Act arose").
 
 
 99
 Accordingly, we look to legislation that Congress has passed specifically affecting Native Hawaiians both before and after 1991. As we have explained, we consider the pre-1991 statutory landscape because it informs us about what Congress had in mind when it reenacted § 1981. We consider the post-1991 statutes to the extent that they demonstrate Congress' own understanding of § 1981. That is, we presume that Congress acts consistently with the extant body of law; statutes enacted after 1991, therefore, must be read consistently with the revised version of § 1981. See Cannon v. Univ. of Chi., 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (concluding that elected officials are presumed to know the law, and that statutes should be read consistently with each other).
 
 
 100
 Beginning as early as 1920, Congress recognized that a special relationship existed between the United States and Hawaii. See Hawaiian Homes Commission Act, 1920, 42 Stat. 108 (1921) (designating approximately 200,000 acres of ceded public lands to Native Hawaiians for homesteading). Over the years, Congress has reaffirmed the unique relationship that the United States has with Hawaii, as a result of the American involvement in the overthrow of the Hawaiian monarchy. See, e.g., 20 U.S.C. § 7512(12), (13) (Native Hawaiian Education Act, 2002); 42 U.S.C. § 11701(13), (14), (19), (20) (Native Hawaiian Health Care Act of 1988).
 
 
 101
 Congress has relied on the special relationship that the United States has with Native Hawaiians to provide specifically for their welfare in a number of different contexts. For example, in 1987, Congress amended the Native American Programs Act of 1974, Pub.L. No. 100-175, § 506, 101 Stat. 926 (1987), to provide federal funds for a state agency or "community-based Native Hawaiian organization" to "make loans to Native Hawaiian organizations and to individual Native Hawaiians for the purpose of promoting economic development in the state of Hawaii." A year later, Congress enacted the Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, § 11703(a), 102 Stat. 2916 (1988), "for the purpose of providing comprehensive health promotion and disease prevention services as well as primary health services to Native Hawaiians."
 
 
 102
 Most importantly for our purposes today, Congress also has focused its attention on the educational disparities faced by Native Hawaiian students. In 1988, just three years before reenacting § 1981, Congress passed the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988. 20 U.S.C. §§ 4901-4909 (1988) (repealed 1994) (hereinafter "Hawkins-Stafford Amendments"). Congress made extensive findings, similar to the findings that it later made in 2002, see supra pp. 833-34, about the educational needs of Native Hawaiians and recognized the necessity for "special efforts in education recognizing the unique cultural and historical circumstances of Native Hawaiians." 20 U.S.C. § 4901(9) (1988) (repealed 1994). For instance, Congress concluded that it has the power to "specially legislate for the benefit of Native Hawaiians," encouraged Native Hawaiians to play an active role in planning and managing Native Hawaiian educational programs, and noted that Native Hawaiians disproportionally fell below their peers in terms of educational achievement and progress. Id. § 4901(2) (1988) (repealed 1994). Congress then went on to affirm specifically the mission of Kamehameha Schools and the Schools' model elementary curriculum, approving by name the Schools' continued research and assessment activities. Id. § 4904(a) (1988) (repealed 1994). Similarly, Congress directed the Secretary of Education to make grants to the Schools "for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." Id. § 4905(a) (1988) (repealed 1994). The sole recipients of that assistance were to be "Native Hawaiians," a term that was defined in the statute, as it is by Kamehameha Schools, as "a descendant of the aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii."[11] Id. § 4909(1)(C) (1988) (repealed 1994).
 
 
 103
 The Hawkins-Stafford Amendments were repealed in 1994. 20 U.S.C. § 4901 (1991) (repealed 1994). But for two reasons that fact does not alter the landscape of Native Hawaiian-oriented congressional enactments against which § 1981 must be read. First, when Congress reenacted § 1981 in 1991, the Hawkins-Stafford Amendments were still in effect. Second, Congress has continued thereafter to emphasize the need for special educational opportunities for Native Hawaiian students. (See Concurrence, p. 856.)
 
 
 104
 After reenacting § 1981, Congress passed the Native Hawaiian Education Act of 1994, 20 U.S.C. §§ 7901-7941, and then reenacted that statute in 2002, 20 U.S.C. §§ 7511-7517 (hereinafter "NHEA"). Like the Hawkins-Stafford Amendments, the NHEA recognized the special needs of Native Hawaiian students and the great disadvantages that they still face in Hawaii. Id. § 7512. As part of the No Child Left Behind Act of 2001, a congressional committee favorably mentioned the Bishop Trust and exhorted the Schools to "redouble [their] efforts" to provide for Native Hawaiians. H.R.Rep. No. 107-63(I), at 333.
 
 
 105
 These steadfast congressional policies favoring remedial measures for Native Hawaiians—and specifically remedial educational measures, some of them even mentioning the Schools and the Bishop Trust approvingly by name—inform our analysis of the validity of the Kamehameha Schools' admissions policy under § 1981. It would be incongruous to conclude that while Congress was repeatedly enacting remedial measures aimed exclusively at Native Hawaiians, at the same time Congress would reject such Native Hawaiian preferences through § 1981. Moreover, by reenacting § 1981 in the midst of passing other legislation to provide specifically and particularly for the education of Native Hawaiians, Congress signaled its clear support for the Kamehameha Schools and for the validity of the Schools' admissions policy.
 
 
 106
 Accordingly, the most plausible reading of § 1981, in light of the Hawkins-Stafford Amendments and the NHEA, is that Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress has repeatedly identified as necessary.
 
 CONCLUSION
 
 107
 King Kamehameha I, on his death bed, is reported to have said, "Tell my people I have planted in the soil of our land the roots of a plan for their happiness." Princess Pauahi Bishop and Her Legacy at 122. His great granddaughter, Princess Bernice Pauahi Bishop, echoed that sentiment when she established, through her will, the Kamehameha Schools. Because the Schools are a wholly private K-12 educational establishment, whose preferential admissions policy is designed to counteract the significant, current educational deficits of Native Hawaiian children in Hawaii, and because in 1991 Congress clearly intended § 1981 to exist in harmony with its other legislation providing specially for the education of Native Hawaiians, we must conclude that the admissions policy is valid under 42 U.S.C. § 1981.
 
 
 108
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 416 F.3d 1025 (9th Cir.2005), reh'g en banc granted, 441 F.3d 1029 (9th Cir.2006).
 
 
 [2]
 This general information simply sets the stage for our more particular consideration of the educational status of Native Hawaiian children
 
 
 [3]
 The Pauahi Bishop Will established two separate schools, one for boys and one for girls. The boys' school opened in 1887 and the girls' school in 1894. During the 1965-1966 school year, the two schools were consolidated
 
 
 [4]
 Disparities abound outside of the educational context as well. Today among the major ethnic groups in Hawaii, Native Hawaiians have the highest rates of unemployment, Ka Huakai at 84, and poverty,id. at 86-87, and the lowest mean family income, id. at 85-86. They live in the poorest geographic areas and are underrepresented in managerial and professional occupations. Id. at 8. Native Hawaiians suffer from greater heath risks than other ethnic groups on the islands, with the lowest life expectancy and highest mortality rates from cancer, heart disease, and diabetes. Id. at 93. Although Native Hawaiians account for approximately 20% of the state's population, they account for more than half of all teenage pregnancies, id. at 203, and more than 44% of child abuse and neglect cases in the state, id. at 206. Native Hawaiians are more likely to be arrested for violent crimes than any other ethnic group in the state. Id. at 76-77.
 
 
 [5]
 Plaintiff now seeks only damages because he is no longer a high school student. This case is not moot, however, because if the Kamehameha Schools' admissions policy were unlawful, Plaintiff has a possible claim for money damages
 
 
 [6]
 The panel's decision generated strong public opposition. Eleven amicus briefs were filed by diverse political and social interests in Hawaii supporting rehearing en banc. These amicus briefs were filed by: (1) the State of Hawaii; (2) the entire Hawaiian congressional delegation; (3) the Mayor of the City and County of Honolulu, and the City and County of Honolulu; (4) the Hawaii Business Roundtable, the Hawaii Korean Chamber of Commerce, the Public Schools of Hawaii Foundation, and the Hawaii Association of Independent Schools; (5) the National Association of Independent Schools; (6) the Parent-Teacher Association of Kamehameha Schools, and the Alumni Association of Kamehameha Schools; (7) the Native Hawaiian Legal Corporation, the Native Hawaiian Bar Association, and Na`A`ahuhiwa; (8) various Hawaiian service organizations; (9) `Ilio`ulaokalani Coalition, an organization of Hawaiian master teachers and cultural experts; (10) the Japanese American Citizens League of Hawaii-Honolulu Chapter and other civic groups; and (11) the National Indian Education Association and the Alaskan Federation of Natives. Additionally, the current governor of Hawaii and a prominent former governor both submitted declarations to the district court on the importance of maintaining the Kamehameha Schools' admissions policyDoe, 295 F.Supp.2d at 1169, 1171; see also Recent Case, Civil Rights—Section 1981— Ninth Circuit Holds that Private School's Remedial Admissions Policy Violates § 1981— Doe v. Kamehameha Schools, 416 F.3d 1025 (9th Cir.2005), 119 Harv. L.Rev. 661, 668 (2005) (concluding that a traditional Title VII approach is not appropriate in the private school context).
 
 
 [7]
 Section 1 of the Civil Rights Act of 1866 provided:
 That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.
 
 
 [14]
 Stat. at 27
 
 
 [8]
 In pertinent part, section 16 of the Enforcement Act of 1870 provides:
 And it be further enacted, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding.
 
 
 [16]
 Stat. at 144
 
 
 [9]
 The Kamehameha Schools are non-profit, rather than commercial. But, because the schools charge tuition (albeit at a rate that represents only a fraction of the cost to educate students), the bargained-for exchange of payments for instruction exists here, as it did inRunyon. We need not and do not decide whether § 1981 would apply if the Schools charged no tuition at all, but simply donated education to Native Hawaiian students.
 In addition, for the purposes of our decision, we accept that "Native Hawaiian"—like "Negro"—is a racial classification. See Rice v. Cayetano, 528 U.S. 495, 514, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (so holding in the context of a voting rights case).
 
 
 [10]
 One student without Native Hawaiian ancestry has been admitted to the Schools in recent years because, for one class, the available seats out-numbered the applicants with Native Hawaiian ancestrySee Timothy Hurley & Walker Wright, Kamehameha Schools admits non-Hawaiian, Honolulu Advertiser, July 12, 2002.
 
 
 [11]
 According to the record, as we have noted, the Kamehameha Schools currently receive no money from Congress
 
 
 
 109
 W. FLETCHER, Circuit Judge, with whom Judges PREGERSON, REINHARDT, PAEZ, and RAWLINSON join, concurring:
 
 
 110
 I fully concur with Judge Graber's majority opinion. However, I write separately because there is an easier and narrower ground for upholding Kamehameha Schools' admissions policy.
 
 
 111
 The question in this case is whether 42 U.S.C. § 1981 forbids Kamehameha Schools from giving Native Hawaiian applicants a conclusive preference for admission into its K-12 programs. In answering this question, the majority opinion assumes that "Native Hawaiian is a racial classification." Op. at 837 n. 9. Based on this assumption, it holds that § 1981 permits private schools, in certain circumstances, to prefer disadvantaged minority groups—not limited to Native Hawaiians—based on race. But the case before us does not involve an admissions policy generally favoring disadvantaged minorities, or favoring specific racial or ethnic groups such as African-Americans or Hispanics. It involves only an admissions policy favoring "Native Hawaiians," defined as persons "descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778." Op. at 832.
 
 
 112
 A narrower ground for sustaining Kamehameha Schools' admissions policy is that "Native Hawaiian" is not merely a racial classification. It is also a political classification. I would divide the question in this case into two sub-questions. First, can Congress constitutionally provide special benefits, including educational benefits, to descendants of Native Hawaiians because "Native Hawaiian" is a political classification? Second, if the answer to this question is yes, has Congress done so in § 1981?
 
 
 113
 I. Constitutionality of Preference for Native Hawaiians
 
 
 114
 Because of their history, ably recounted in the majority opinion, Native Hawaiians constitute a unique population that has a "special trust relationship" with the United States. Congress has repeatedly "affirmed," "acknowledged," "reaffirmed," and "recognized" that relationship. See 20 U.S.C. § 7512(8)-(13); 42 U.S.C. § 11701(13)-(16), (19)-(21); see also S. Joint Res. No. 19, Pub.L. No. 103-150, 107 Stat. 1510 (1993) ("Apology Resolution"). Based on this "historical and unique legal relationship," Congress has enacted more than 150 laws that "extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities." 42 U.S.C. § 11701(19); see Rice v. Cayetano, 528 U.S. 495, 533, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Stevens, J., dissenting); see also Jon M. Van Dyke, The Political Status of the Native Hawaiian People, 17 Yale L. & Pol'y Rev. 95, 106 n. 67 (1998) (listing a sampling of statutes that provide separate benefit programs for Native Hawaiians or include them in benefit programs that assist other native people).
 
 
 115
 Congress has stated in support of such statutes that "the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives," 20 U.S.C. § 7512(12)(D), and that "[t]he authority of Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawaii." 42 U.S.C. § 11701(17). Congress has emphasized that it "does not extend services to Native Hawaiians because of their race, but because of their unique status as indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." 20 U.S.C. § 7512(12)(B).
 
 
 116
 In Morton v. Mancari, 417 U.S. 535, 539, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), "non-Indian employees" of the Bureau of Indian Affairs challenged a hiring preference for American Indians as "invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment." The Court held that the tribal Indian classification is "political rather than racial in nature." Id. at 554 n. 24, 94 S.Ct. 2474. Benefits were "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." Id. at 554, 94 S.Ct. 2474. Citing the "special relationship" doctrine, the Court held that the tribal Indian classification did not trigger strict scrutiny.
 
 
 117
 The special relationship doctrine is based on an acknowledgment that the United States "`overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people.'" Id. at 552, 94 S.Ct. 2474 (quoting Bd. of County Comm'rs v. Seber, 318 U.S. 705, 715, 63 S.Ct. 920, 87 L.Ed. 1094 (1943)); see also United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) ("From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power."). The Court in Mancari noted that "[i]t is in this historical and legal context that the constitutional validity of the Indian preference is to be determined." 417 U.S. at 553, 94 S.Ct. 2474. Since the preference "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians," the Court held that it does not violate the equal protection component of the Due Process Clause. Id. at 555, 94 S.Ct. 2474.
 
 
 118
 In other contexts, the Supreme Court has not insisted on continuous tribal membership, or tribal membership at all, as a justification for special treatment of Indians. In United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), decided after Mancari, the Court held that "Indian country," as used in 18 U.S.C. § 1151, included the Choctaw Indian Reservation in Mississippi. The Court noted that for many years the Choctaw lands in Mississippi had not been reservation lands, and that some Choctaws may have been considered to be reservation Indians based on their having "one-half or more Indian blood" rather than on any tribal membership. Id. at 650, 98 S.Ct. 2541. The Court concluded, "Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them." Id. at 653, 98 S.Ct. 2541. In Delaware Tribal Business Committee v. Weeks, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977), also decided after Mancari, the Court upheld against a due process challenge a distribution of funds to both tribal and non-tribal Indians as "`special treatment [that] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians.'" Id. at 85, 97 S.Ct. 911 (quoting Mancari, 417 U.S. at 555, 94 S.Ct. 2474).
 
 
 119
 For its part, Congress has repeatedly provided special treatment, including distribution of funds, based on broad definitions of the terms "Indian," "native," "Native American," and "tribal organization" that encompass Indians who are not members of federally recognized tribes. See, e.g., 25 U.S.C. § 479 (defining "Indian" to include "persons of one-half or more Indian blood" who are not also tribal members); id. § 500n (defining "natives of Alaska" as "native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession of Alaska to the United States and their descendants of whole or part blood"); id. § 1603(c) (defining "Indian" to include "any individual who (1), irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, or (2) is an Eskimo or Aleut or other Alaska Native, or (3) is considered by the Secretary of the Interior to be an Indian for any purpose"); id. § 1679(b)(2) (defining "Eligible Indians" to include members of non-federally recognized tribes so long as the person can demonstrate descent from an Indian resident in California as of 1852); id. § 2902(1) (defining "Native American" as "an Indian, Native Hawaiian, or Native American Pacific Islander"); 38 U.S.C. § 3765(4) (defining "tribal organization" to include "the Department of Hawaiian Homelands, in the case of native Hawaiians, and such other organizations as the Secretary may prescribe"); 42 U.S.C. § 3002(20) (defining "Native American" as a member of an Indian tribe or a Native Hawaiian); 43 U.S.C. § 1602(b) (defining "Native" as "a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community) Eskimo, or Aleut blood, or combination thereof").
 
 
 120
 We observe "the time-honored presumption" that the passage of the many federal statutes benefitting Native Hawaiians, Alaska Natives, and American Indians "is a `constitutional exercise of legislative power.'" Reno v. Condon, 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (quoting Close v. Glenwood Cemetery, 107 U.S. 466, 475, 2 S.Ct. 267, 27 L.Ed. 408 (1883)). The basis for this exercise of power is Congress' conclusion that "Native Hawaiian," like "Alaska Native" and "Indian," is a political classification subject to the special relationship doctrine. Unless we were to hold that Congress cannot legislate for the special benefit of Native Hawaiians, thereby striking down the enormous swaths of the United States Code enacted pursuant to the special relationship doctrine, we must conclude that the doctrine permits Congress to provide special benefits to Native Hawaiians.
 
 
 121
 I recognize that the Court has struck down a statute granting preferential voting rights to Native Hawaiians, but voting rights are sui generis. In Rice v. Cayetano, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), the Supreme Court addressed a provision of the Hawaiian Constitution limiting to "Hawaiians" the right to vote in a certain statewide election. The term "Hawaiians" was generally defined as descendants of people inhabiting the Hawaiian Islands in 1778. Id. at 499, 509, 120 S.Ct. 1044. The Court held that under the Fifteenth Amendment "Congress may not authorize a State to create a voting scheme of this sort." Id. at 519, 120 S.Ct. 1044. In so holding, the Court assumed "authority in Congress, delegated to the State, to treat Hawaiians or native Hawaiians as tribes," id., but it refused to extend the special relationship doctrine to the "new and larger dimension" of voting restrictions in state elections. Id. at 520, 120 S.Ct. 1044.
 
 
 122
 The Court in Rice was careful to confine its analysis to voting rights under the Fifteenth Amendment. It cautioned that 19094 "[t]he validity of the voting restriction is the only question before us." Id. at 521, 120 S.Ct. 1044. Emphasizing the importance and unique character of voting rights under the Fifteenth Amendment, the Court wrote, "the Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment." Id. at 512, 120 S.Ct. 1044. Further, "use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve." Id. at 517, 120 S.Ct. 1044; see also Shaw v. Reno, 509 U.S. 630, 657, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("Racial classifications with respect to voting carry particular dangers.").
 
 
 123
 Unlike Rice, the case before us does not involve preferential voting rights subject to challenge under the Fifteenth Amendment. Rather, it involves the preferential provision of educational benefits. To the extent that the federal Constitution is implicated at all, the relevant text is the Equal Protection Clause of the Fourteenth Amendment. The Court in Rice never questioned the validity of the special relationship doctrine under the Fourteenth Amendment, and never even hinted that its Fifteenth Amendment analysis would apply to the many benefit programs enacted by Congress for Native Hawaiians, Alaska Natives, and American Indians.
 
 
 124
 I therefore conclude that Congress may, if it wishes, permit Kamehameha Schools to give preferential admissions treatment to Native Hawaiians. The remaining question is whether Congress has in fact done so under § 1981.
 
 II. Section 1981
 
 125
 When Congress enacted § 1981 in the Civil Rights Act of 1866, Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27, and reenacted it four years later in the Enforcement Act of 1870, Act of May 31, 1870, ch. 114, §§ 16, 18, 16 Stat. 144, the Hawaiian Islands were still a sovereign kingdom whose people were not "within the jurisdiction of the United States."[1] As stated by Congress, "from 1826 until 1893, the United States recognized the independence of the Kingdom of Hawaii, extended full and complete diplomatic recognition to the Hawaiian Government, and entered into treaties and conventions with the Hawaiian monarchs to govern commerce and navigation in 1826, 1842, 1849, 1875, and 1887." Apology Resolution, Pub.L. No. 103-150, 107 Stat. at 1510.
 
 
 126
 For many years after the Hawaiian Kingdom was over-thrown in 1893, and even after the State of Hawaii was admitted to the Union in 1959, § 1981 posed no threat to Kamehameha Schools' preferential admissions policy. But in 1976 the Supreme Court held that § 1981 reaches both (1) admissions programs at private schools that categorically exclude African-Americans, Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and (2) racial discrimination in private employment against whites as well as nonwhites, McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Together, these cases intimated that § 1981 might prohibit private school admissions policies that exclude whites.
 
 
 127
 In 1991, Congress revised and reenacted § 1981. See Civil Rights Act of 1991, Pub.L. No. 102-166, § 101, 105 Stat. 1071, 1071-72. By this time, Congress had enacted numerous statutes that provided exclusive benefit programs for Native Hawaiians or included them in benefit programs for other native peoples. Indeed, just a few years before reenacting § 1981, Congress passed many laws that gave exclusive contractual or grant benefits to Native Hawaiians and Native Hawaiian organizations.[2] Congress proclaimed that its Native Hawaiian benefit programs are "consistent with the historical and unique legal relationship of the United States with the government that represented the indigenous native people of Hawaii," Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, § 2(2), 102 Stat. at 2916 (codified as amended at 42 U.S.C. § 11701), and that this relationship gives Congress "the power to specially legislate for the benefit of Native Hawaiians." Hawkins-Stafford Amendments, Pub.L. No. 100-297, tit. IV, § 4001(2), 102 Stat. at 358 (formerly codified at 20 U.S.C. § 4901(2)) (repealed 1994).
 
 
 128
 When Congress reenacted § 1981, two recently passed laws directed Kamehameha Schools—by name—to provide educational benefits to Native Hawaiians, and only Native Hawaiians. The Hawkins-Stafford Amendments, passed in 1988, instructed the Secretary of Education to "make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." Id. § 4005(a), 102 Stat. at 360. One year before reenacting § 1981, Congress amended the Public Health Service Act to direct the Secretary to "provide funds to Kamehameha Schools/Bishop Estate for the purpose of providing scholarship assistance" to eligible Native Hawaiian students. Act of Nov. 29, 1990, Pub.L. No. 101-644, § 401, 104 Stat. 4662, 4668 (codified as amended at 42 U.S.C. § 254s). These federal statutes specifically directed Kamehameha Schools to do precisely what plaintiffs in this case say is forbidden by § 1981.
 
 
 129
 It was not until the 1991 amendments to § 1981 that Congress specified that it intends courts to apply the statute to substantive discrimination by private actors. See 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."). In order to hold for plaintiff in this case, we would have to conclude that Congress intended this provision to invalidate, sub silentio, the recently enacted legislation that provided loans and scholarships exclusively to Native Hawaiians at Kamehameha Schools. But this conclusion would require us to turn our back on the Supreme Court's analysis in Mancari, where it rejected the challenge of non-Indian plaintiffs to Indian employment preferences as inconsistent with the federal Equal Employment Opportunity Act of 1972.
 
 The Mancari plaintiffs argued that
 
 130
 since the [Equal Employment Opportunity Act of 1972] proscribed racial discrimination in Government employment, the Act necessarily, albeit sub silentio, repealed the provision of the [Indian Reorganization Act of 1934] that called for the preference in the [Bureau of Indian Affairs] of one racial group, Indians, over non-Indians.
 
 
 131
 Mancari, 417 U.S. at 547, 94 S.Ct. 2474. The 1972 Act, upon which the Mancari plaintiffs relied, amended Title VII of the Civil Rights Act of 1964. Id. at 546-47, 94 S.Ct. 2474. Whereas the 1964 Civil Rights Act had expressly exempted certain Indian preferences, neither the text nor the legislative history of the amending 1972 Act made any reference to such preferences. Id. Given that the 1972 Act was specifically modeled on the 1964 Act, the omission of an exemption for Indian preferences was especially glaring, and the plaintiffs' argument for sub silentio repeal especially strong.
 
 
 132
 Nevertheless, the Supreme Court unanimously and emphatically rejected the argument for sub silentio repeal by the 1972 Amendment:
 
 
 133
 It would be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference. Appellees' assertion that Congress implicitly repealed the preference as racially discriminatory, while retaining the 1964 preferences, attributes to Congress irrationality and arbitrariness, an attribution we do not share.
 
 
 134
 . . . Three months after Congress passed the 1972 amendments, it enacted two new Indian preference laws . . . . It is improbable, to say the least, that the same Congress which affirmatively approved and enacted these additional and similar Indian preferences was, at the same time, condemning the BIA preference as racially discriminatory. In the total absence of any manifestation of supportive intent, we are loathe to imply this improbable result.
 
 
 135
 * * *
 
 
 136
 This is a prototypical case where an adjudication of repeal by implication is not appropriate. The preference is a longstanding, important component of the Government's Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem. Any perceived conflict is thus more apparent than real. . . . A provision aimed at furthering Indian self-government by according an employment preference within the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by formalistic reasoning that ignores both the history and purposes of the preference and the unique legal relationship between the Federal Government and tribal Indians.
 
 
 137
 Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.
 
 
 138
 The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.
 
 
 139
 Id. at 548-51, 94 S.Ct. 2474 (emphasis added) (citations omitted).
 
 
 140
 The principal dissent insists that the failure of § 1981 to include in its text an explicit exception for Native Hawaiians is fatal to Kamehameha Schools' admissions policy. But of all the federal statutes to which strict text-based rules of statutory construction might be applied, § 1981 is a particularly inappropriate candidate. The text of § 1981 only guarantees "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It does not guarantee the converse—the right of white persons or citizens to enjoy the same contractual rights as non-whites. Therefore, according to the dissent's interpretive method, § 1981 should not be read to protect whites against private racial discrimination. But we know that, despite the clear text of § 1981, this conclusion would be wrong, for the Supreme Court held in 1976 that whites as well as non-whites are protected under § 1981. McDonald, 427 U.S. at 286-87, 96 S.Ct. 2574.
 
 
 141
 Congress' provision of educational benefits to Native Hawaiians continues to this day. Congress repealed the Native Hawaiian provisions of the Hawkins-Stafford Amendments only to replace them with the more comprehensive Native Hawaiian Education Act ("NHEA"), Pub.L. No. 103-382, §§ 9201 et seq., 108 Stat. 3794 (1994) (formerly codified at 20 U.S.C. §§ 7901 et seq.) (repealed 2002), which Congress later reenacted in the No Child Left Behind Act of 2001. 20 U.S.C. §§ 7511 et seq. As part of the No Child Left Behind Act of 2001, a congressional committee exhorted the Bishop Trust, which finances Kamehameha Schools, to "redouble its efforts to educate Native Hawaiian children." H.R.Rep. No. 107-63(I), at 333.
 
 
 142
 The NHEA continues to allocate money to private non-profit organizations to provide programs for the exclusive benefit of Native Hawaiians. See 20 U.S.C. § 7515. Kamehameha Schools' definition of "Native Hawaiian" is virtually identical to that used in the NHEA. See 20 U.S.C. § 7517(1)(B) (defining "Native Hawaiian" as "a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii"). The NHEA expressly declares that "Congress does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." 20 U.S.C. § 7512(12)(B).
 
 
 143
 Through the NHEA and the myriad other federal statutes that confer benefits on Native Hawaiians, Congress has made manifest its intent to apply some form of the special relationship doctrine to Native Hawaiians. The well established general rule is that less—not more—demanding scrutiny applies to private discrimination than to government-sponsored discrimination. It would be deeply ironic for us to hold that § 1981 forbids private institutions from giving Native Hawaiians educational benefits when, at the same time, Congress itself provides such benefits and provides public funds for private organizations to do the same.
 
 Conclusion
 
 144
 Congress has invariably treated "Native Hawaiian" as a political classification for purposes of providing exclusive educational and other benefits. Under the special relationship doctrine, Congress has the power to do so. I see nothing in § 1981 to indicate that Congress intended to impose upon private institutions a more restrictive standard for the provision of benefits to Native Hawaiians than it has imposed upon itself.
 
 
 
 Notes:
 
 
 [1]
 The 1866 statute used slightly different language, but to the same effect: the statute applied to "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed." 14 Stat. 27
 
 
 [2]
 See, e.g., Native American Programs Act Amendments of 1987, Pub.L. No. 100-175, § 506, 101 Stat. 973, 976-78 (establishing "Revolving Loan Fund for Native Hawaiians" to promote economic and social self-sufficiency of Native Hawaiians); Jacob K. Javits Gifted and Talented Students Education Act of 1988, Pub.L. No. 100-297, tit. I, § 4104, 102 Stat. 237, 238 (authorizing grants or contracts with institutions (including Indian tribes and Native Hawaiian organizations) to carry out programs or projects designed to meet the educational needs of gifted and talented children); Drug-Free Schools and Communities Act of 1986, Pub.L. No. 100-297, tit. I, § 5134, 102 Stat. 252, 261 (1988) (authorizing education grants, cooperative agreements, or contracts with organizations that primarily serve and represent Native Hawaiians); Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 ("Hawkins-Stafford Amendments"), Pub.L. No. 100-297, tit. IV, §§ 4001 et seq. ("Education for Native Hawaiians"), 102 Stat. 130, 358-63 (repealed 1994) (authorizing and developing supplemental educational programs to benefit Native Hawaiians); Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, 102 Stat. 2916 (authorizing programs to improve the health status of Native Hawaiians); Handicapped Programs Technical Amendments Act of 1988, Pub.L. No. 100-630, § 102, 102 Stat. 3289, 3296 (amending the Education of the Handicapped Act to provide handicapped Native Hawaiian (and other native Pacific basin) children with a free appropriate public education); Business Opportunity and Development Reform Act of 1988, Pub.L. No. 100-656, § 207, 102 Stat. 3853, 3861-62 (amending the Small Business Act by including economically disadvantaged Native Hawaiian organizations as socially and economically disadvantaged small business concerns); Indian Health Care Amendments of 1988, Pub.L. No. 100-713, § 106, 102 Stat. 4784, 4787-88 (amending the Public Health Service Act by creating a Native Hawaiian Health Professions Scholarship program).
 
 
 
 145
 BYBEE, Circuit Judge, with whom Judges KOZINSKI, O'SCANNLAIN, TALLMAN, and CALLAHAN join, and with whom Judges RYMER and KLEINFELD join in Parts II and III, dissenting:
 
 
 146
 This case involves the application of one of the Republic's oldest and most enduring civil rights statutes, 42 U.S.C. § 1981. That statute—originally enacted as section sixteen of the Civil Rights Act of 1870—provides in pertinent part that, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2000). Enacted soon after the passage of the Thirteenth and Fourteenth Amendments, § 1981 like—and perhaps more than—most of the reconstruction era civil rights enactments was intended to ensure "that a dollar in the hands of [any citizen] will purchase the same thing as a dollar in the hands of a white man." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 443, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Applying that principle in Runyon v. McCrary, 427 U.S. 160, 168, 179, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court held that § 1981 "prohibits private, commercially operated, non-sectarian schools from denying admission to prospective students because they are" not members of a favored racial group. Indeed, as Runyon makes clear, discriminating against a private school applicant solely on the basis of that applicant's race "amounts to a classic violation of § 1981." Id. at 172, 96 S.Ct. 2586.
 
 
 147
 Despite that well-established principle, the majority today stands Runyon on its head and holds that a private school may deny admission to a prospective student solely because he or she is not a member of a particular race. Though I agree with the majority that Native Hawaiians suffer from severe socio-economic disadvantages and believe that Kamehameha Schools ("Kamehameha") should be commended for attempting to remedy those hardships, I cannot concur with the majority's dramatic departure from Runyon.
 
 
 148
 In my view, the majority has made a number of crucial mistakes. Thus, as set out below in Part I, even though I agree with the majority that Title VII and not strict scrutiny provides the standard of review in this case, I disagree with the majority's sweeping modification of the Title VII standard. Moreover, even if I agreed with the majority's departure from that standard, I could not subscribe to the majority's decision to sanction an absolute racial bar. Likewise, as set out in Part II, I cannot accept as a matter of faithful statutory construction the majority's view that Congress implicitly exempted racial preferences for Native Hawaiians from § 1981 by passing unrelated—and even since repealed—statutes. Indeed, I believe the majority's novel approach to statutory interpretation is readily manipulable and would enable courts to rewrite statutes whenever they want to save a particular program, contract, or enactment. Finally, as set out in Part III, because Native Hawaiians do not constitute a federally recognized tribe and Kamehameha is a private party, I also disagree with Judge Fletcher's suggestion that the special relationship doctrine of Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), can save Kamehameha's racially exclusive admissions policy.
 
 
 149
 As much as I may believe that Kamehameha should be applauded for providing its students an exceptional education and for attempting to remedy the socioeconomic disadvantages facing Native Hawaiians, I cannot turn a blind eye to a classic violation of § 1981. Noble as Kamehameha's goals may be, good intentions are not license to violate our civil rights laws. Accordingly, I respectfully dissent.
 
 
 150
 I. REVIEW OF § 1981 UNDER TITLE VII STANDARDS
 
 
 151
 The John Doe plaintiff contends that Kamehameha's admissions policy—which bars the admission of any non-Native Hawaiian student, see Maj. Op. at 844 & n. 10—violates 42 U.S.C. § 1981 because, as Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), makes clear, discriminating against a private school applicant solely on the basis of that applicant's race "amounts to a classic violation of § 1981." Id. at 172, 96 S.Ct. 2586. Despite the inherent logic of plaintiff's argument, the majority avoids reaching a similar conclusion by holding "[q]uite simply, Runyon is inapposite," Maj. Op. at 843, and grafting a modified Title VII standard onto § 1981.
 
 
 152
 To create that new standard, the majority dismisses Runyon as irrelevant because "[t]he program at issue in Runyon would certainly fail" the majority's analysis. Id. In so holding, however, the majority ignores the critical fact that the admissions programs involved in Runyon—like Kamehameha's—violated § 1981 because they used race as the determinative admissions factor. Instead, the majority converts Runyon into a case about a "whites-only admissions" program that is "inapposite" to Kamehameha's Native Hawaiians-only admissions policy. Id. I find the majority's decision to dismiss Runyon in order to approve a policy that bars African American (and any other) children who lack Native Hawaiian ancestry to be unfortunate and wrong.
 
 
 153
 Putting those concerns aside for the moment, and turning to the next step in the majority's analysis, the majority holds that Title VII scrutiny, and not strict scrutiny, applies to alleged § 1981 violations. Maj. Op. at 839. That second step in the majority's analysis is sound. Like the majority, I agree that Title VII standards and not strict scrutiny must apply to § 1981 actions because to hold otherwise would effectively render the Title VII's provisions that expressly contemplate affirmative action plans nonsensical. Maj. Op. at 839; see also Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498-99 (3d Cir.1999); Edmonson v. United States Steel Corp., 659 F.2d 582, 584 (5th Cir.1981) (per curiam); Setser v. Novack Inv. Co., 657 F.2d 962, 966-68 (8th Cir.1981) (en banc).
 
 
 154
 Applying the Title VII approach, the majority also correctly holds that the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to plaintiff's § 1981 claim. See Maj. Op. at 837-38. Under that test, "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. Where an explicit race-based policy exists, proof of that fact alone is sufficient to establish a prima facie case. If the plaintiff proves his prima facie case, a rebuttable presumption of intentional discrimination arises, see Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and the burden of production "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the conduct at issue. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. "The existence of an affirmative action plan provides such a rationale." Johnson v. Transp. Agency, 480 U.S. 616, 626, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). "If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that . . . the plan is invalid." Id.
 
 
 155
 As Kamehameha concedes that it employs a preference that favors Native Hawaiian applicants, plaintiff has met his burden to show a prima facie case of racial discrimination. Maj. Op. at 839-40. Kamehameha argues, however, that its conduct is permissible because its admissions policy was executed pursuant to an affirmative action plan, thereby rebutting the presumption of illegality. Thus, as the majority concludes, this case hinges entirely on the third step of the McDonnell Douglas analysis—i.e., whether Kamehameha's plan is invalid. See Maj. Op. at 839-40.
 
 
 156
 It is at this point, when the majority entirely reworks the standards for determining whether an affirmative action plan is valid, that the majority's analysis goes astray. Under United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), and Johnson v. Transportation Agency, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), an affirmative action program must satisfy the following factors to be considered valid: (1) It must be "justified by the existence of a `manifest imbalance'" in the employer's workforce that is reflective of traditionally segregated job categories; (2) it may not "`unnecessarily trammel[ ] the rights of [other] employees or create[ ] an absolute bar to their advancement'"; and (3) it must "be designed to do[no] more than `attain a balance.'" Rudebusch v. Hughes, 313 F.3d 506, 520 (9th Cir.2002) (first and third alteration in original) (quoting Johnson, 480 U.S. at 631, 637-38, 639, 107 S.Ct. 1442).[1]
 
 
 157
 Reasoning that primary and secondary educational contracts are different, however, the majority alters all three factors and holds that a private school may discriminate on the basis of race whenever: (1) "significant imbalances in educational achievement [in the community as a whole] presently affect the target population"; (2) the discriminatory policy does not "unnecessarily trammel[ ] the rights of students in the non-preferred" racial group as a whole "or create an absolute bar to their advancement"; and (3) "the[discriminatory] policy [does] no more than is necessary to correct the imbalance . . . identified at the first step." Maj. Op. at 842.
 
 
 158
 Though I recognize that the Title VII standard was forged in the employment discrimination context and that some modification may be necessary to adapt it to other settings, I disagree, as explained below, with the majority's general justification for departing from precedent and with each specific alteration it makes to the Title VII standard. Furthermore, I also disagree with the majority's application of its own standard.
 
 
 159
 A. The Majority's Modification of the Title VII Standard
 
 
 160
 The majority creates a standard that, by its own terms, applies only to primary and secondary schools. It grounds that decision entirely on its finding that the ordinary Title VII standard, which was developed in the employment setting, cannot apply to primary and secondary educational contracts. But, there is absolutely nothing in § 1981's text to suggest that contracts made with "private employers [that] strive primarily to make money[ ] and public employers [that] perform a specific public function" should be subject to a different standard than primary and secondary schools that have "a much broader [external] mission." Maj. Op. at 842. Indeed, the majority neglects the fact that § 1981 guarantees to "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). Given § 1981's plain text, then, it is not surprising that the majority cannot cite a single case to support the novel proposition that primary and secondary educational contracts are different from other contracts and are entitled to special treatment under § 1981.
 
 
 161
 In fact, the Supreme Court has rejected that very argument. For instance, far from finding that a school's "much broader mission" or external focus made a difference, Runyon—which involved a racially exclusive primary and secondary private school admissions policy—reasoned:
 
 
 162
 It is apparent that the racial exclusion practiced by the Fairfax-Brewster School and Bobbe's Private School amounts to a classic violation of § 1981. The parents . . . sought to enter into contractual relationships with [the schools] for educational services . . . . Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments . . . . [N]either school offered services on equal basis to white and nonwhite students. . . . [Plaintiffs] were denied admission to the schools because of their race. The . . . conclusion that § 1981 was thereby violated follows inexorably from the language of that statute, as construed in [prior Supreme Court case law].
 
 
 163
 427 U.S. at 172-73, 96 S.Ct. 2586 (quotation and citation omitted) (footnote omitted). Thus, the majority's argument that primary and secondary private school educational contracts should be treated differently from other contracts under § 1981 was squarely rejected in Runyon, and I would adhere to that precedent.
 
 
 164
 Similarly, the majority's rationale does not find any support in Title VII jurisprudence. Indeed, under Title VII the Supreme Court has uniformly measured affirmative action programs against the standard established in Weber as explained above. For example, Johnson employed Weber to determine the validity of a county transportation agency's affirmative action program under Title VII. 480 U.S. at 626-40, 107 S.Ct. 1442; see also id. at 631, 107 S.Ct. 1442 ("[W]e must first examine whether [the employment] decision was made pursuant to a plan prompted by concerns similar to those of the employer in Weber. Next, we must determine whether the effect of the plan on[the non-preferred race] is comparable to the effect of the Plan in that case."); id. at 627, 107 S.Ct. 1442 ("The assessment of the legality of the Agency Plan must be guided by our decision in Weber." (footnote omitted)).
 
 
 165
 Our own jurisprudence has closely followed the Supreme Court's lead in this area, and, as the majority candidly concedes, under Title VII, we have always applied the same standard, even when the program "at issue was not wholly analogous to the hiring and promotional plans at issue in Weber and Johnson because of some significant conceptual differences between the types of plans," Maj. Op. at 841 (citation and internal quotation marks omitted).[2] Our sister circuits have done the same, even when the case involved primary and secondary schools that have "a much broader [external] mission." See, e.g., Taxman v. Bd. of Educ. of Twp. of Piscataway, 91 F.3d 1547, 1564 (3d Cir. 1996) (en banc) (evaluating a plan for the hiring and firing of primary and secondary school teachers under the Weber standard), cert. granted, 521 U.S. 1117, 117 S.Ct. 2506, 138 L.Ed.2d 1010 (1997), cert. dismissed, 522 U.S. 1010, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997); Cunico v. Pueblo Sch. Dist. No. 60, 917 F.2d 431, 437-38 (10th Cir.1990) (evaluating a race conscious lay-off plan for primary and secondary school personnel under the Weber standard).
 
 
 166
 The majority fails to explain why we must create a special standard for primary and secondary educational contract cases.[3] If anything, as highlighted above, Runyon compels the conclusion that a primary and secondary educational contract—like any other contract—that discriminates solely on the basis of race violates § 1981. See 427 U.S. at 172, 96 S.Ct. 2586. As noted above, I also disagree with the majority's far-reaching adaption of all three of the Supreme Court's factors for determining the validity of an affirmative action program, to which I now turn.
 
 
 167
 1. Manifest Imbalance Reflecting Traditional Segregation
 
 
 168
 The majority has substantially modified the Court's first factor. Under the first Weber and Johnson factor, the Supreme Court has required that a Title VII affirmative action program be "justified by the existence of a manifest imbalance that reflected underrepresentation of [the favored group] in traditionally segregated job categories." Johnson, 480 U.S. at 631, 107 S.Ct. 1442 (internal quotation marks omitted); accord Weber, 443 U.S. at 208, 209, 99 S.Ct. 2721; id. at 212-15, 99 S.Ct. 2721 (Blackmun, J., concurring). Our cases have consistently and faithfully applied this requirement. See, e.g., Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 725 (9th Cir.1992) ("Under Title VII analysis, voluntary adoption of a race-based remedy may be justified by a showing that a manifest imbalance exists, reflecting underrepresentation of [the favored group] in traditionally segregated job categories." (internal quotations omitted)); Davis v. City & County of S.F., 890 F.2d 1438, 1448 (9th Cir.1989) (same); Higgins v. City of Vallejo, 823 F.2d 351, 356 (9th Cir.1987) (same); La Riviere v. EEOC, 682 F.2d 1275, 1278 (9th Cir.1982) (applying the same standard to a sex-based affirmative action plan).
 
 
 169
 Likewise, we have consistently applied the Supreme Court's holding that "[i]n determining whether an imbalance exists that would justify taking . . . race into account, a comparison of the percentage of minorities . . . in the employer's work force with the percentage in the area labor market . . . is appropriate. . . ." Johnson, 480 U.S. at 631-32, 107 S.Ct. 1442 (emphasis added); accord Weber, 443 U.S. at 204-206, 99 S.Ct. 2721; Davis, 890 F.2d at 1448 ("To determine whether such an imbalance has occurred, the court may compare the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population." (emphasis added)); Higgins, 823 F.2d at 356-57 (similar).
 
 
 170
 In other words, until today, two findings were required to satisfy this first factor: (1) the present existence of a manifest imbalance in a particular job category in the employer's workforce; and (2) that this imbalance stems from historical segregation in that job category. Those separate requirements guaranteed two critical things: First, with respect to the scope of the program, they guaranteed that there was a particular goal in sight—namely, representation of the historically disadvantaged group in the employer's workforce in proportion to its representation in the relevant labor pool. Johnson, 480 U.S. at 631-32, 633 n. 10, 107 S.Ct. 1442; Weber, 443 U.S. at 198-99, 208-09, 99 S.Ct. 2721. By requiring a goal based on the employer's own practices, Weber and Johnson were willing to permit affirmative action programs without giving all employers license to discriminate in favor of any group that currently finds itself disadvantaged anywhere in the labor market. Second, those requirements ensured that there was a temporal constraint, a well-defined point after which the preference program would no longer be necessary—that is, once the "manifest imbalance" in the employer's workforce had been corrected. Johnson, 480 U.S. at 632, 107 S.Ct. 1442 ("The requirement that `the manifest imbalance' relate to a `traditionally segregated job category' provides assurance both that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefiting from the plan will not be unduly infringed."); Weber, 443 U.S. at 208-09, 99 S.Ct. 2721 ("[T]he plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force."). Moreover, an affirmative action program that correlates to an employer's own internal practices is necessarily limited in scope and time, because correcting the "manifest imbalance" is reasonably within the employer's control.
 
 
 171
 In contrast to Weber and Johnson, the majority's test merely requires a private school to "demonstrate that specific, significant imbalances in educational achievement presently affect the target population" in the relevant community.[4] Maj. Op. at 842. Thus, by completely eliminating any school-based analysis and jettisoning any historical inquiry,[5] the majority rejects the constraint developed in the Title VII context that affirmative action programs must be limited in scope and duration. Indeed, the majority effectively green-lights discrimination so long as the identified group currently suffers from "significant imbalances in educational achievement." Id. at 844. Because such a broad and perpetual license conflicts with the Supreme Court's consistent emphasis on the limited and temporary nature of permissible affirmative action plans, see, e.g., Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 475-79, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), I cannot endorse the majority's new standard. See also, e.g., Grutter v. Bollinger, 539 U.S. 306, 342, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("The requirement that all race-conscious admissions programs have a termination point `assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.'" (quoting Richmond v. J.A. Croson Co., 488 U.S. 469, 510, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion)); Weber, 443 U.S. at 208, 99 S.Ct. 706, 102 L.Ed.2d 854 (noting the affirmative action plan in that case was "a temporary measure"); W. States Paving Co., Inc. v. Wash. State Dep't of Transp., 407 F.3d 983, 994 (9th Cir.2005) ("A narrowly tailored remedial program must also include adequate durational limitations."); Smith v. Univ. of Wash., 392 F.3d 367, 375 (9th Cir.2004) ("[R]ace-conscious admissions programs must be limited in time.").
 
 
 172
 2. Unnecessary Trammeling the Rights of the Non-Preferred Group
 
 
 173
 The majority's alteration of Weber and Johnson's second factor is similarly problematic. Under the second factor, an affirmative action plan must not "unnecessarily trammel[ ] the rights of [members of the disfavored group] or create[ ] an absolute bar to their advancement." Johnson, 480 U.S. at 637-38, 107 S.Ct. 1442; accord Weber, 443 U.S. at 208, 99 S.Ct. 2721. The majority echoes this test, Maj. Op. at 842, but it makes two important modifications.
 
 
 174
 First, under the majority's test, whether a discriminatory policy creates an absolute bar or unnecessarily trammels the rights of the disfavored race is determined by reference to "the respective rights of members of the non-preferred group" "viewed in the relevant community, rather than in a single school." Maj. Op. at 842. Thus, under the majority's new standard, we must not consider the rights of a non-preferred individual at the institution in question but in the larger context of his ability to access quality education. See id. at 842. Again, as indicated above, that standard conflicts with the established principle that we look at the particular institution adopting the affirmative action program to determine whether the rights of a member of the disfavored group have been trammeled. See, e.g., Johnson, 480 U.S. at 638, 107 S.Ct. 1442 ("[W]hile petitioner in this case was denied a promotion, he retained his employment with the Agency, at the same salary and with the same seniority, and remained eligible for other promotions."); id. at 638 n. 15, 107 S.Ct. 1442 ("Of the 111 new Skilled Craft jobs [at the Agency] during [the relevant] period, 105, or almost 95%, went to men."); id. at 642, 107 S.Ct. 1442 ("The decision to [hire Joyce instead of the plaintiff] was made pursuant to an affirmative action plan that represents a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women in the Agency's work force." (emphasis added)); Weber, 443 U.S. at 208, 99 S.Ct. 2721 ("The plan does not require the discharge of white workers and their replacement with new black hirees. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white." (citation omitted)).
 
 
 175
 Indeed, it is contrary to the spirit—and, I had always assumed, based on the cases cited above, the letter—of the civil rights laws to explain to a worker who has been discriminated against that the situation is not so bad because there are lots of other jobs available. Yet that is the essence of the majority's new standard: If the majority thinks there are adequate educational alternatives for the disfavored race, then the fact that the institution in question has discriminated against that race is of no concern. "Context" alone cannot explain why, under the majority's view, racial discrimination in some communities would be wrong and actionable, but in other communities, it would be acceptable and praiseworthy. I cannot join the majority's analysis.
 
 
 176
 The majority makes a second important modification and announces that in determining whether an affirmative action plan trammels rights or creates an absolute bar, we do not look at whether an individual has been denied an opportunity, but whether the individual's racial group "within the community as a whole" has been denied an opportunity. See Maj. Op. at 844-45 (holding that because "nothing in the record suggests that educational opportunities in Hawaii are deficient for students, like Plaintiff, who lack any native Hawaiian ancestry," Kamehameha's admissions "policy neither unnecessarily trammels the rights of non-Native Hawaiians nor absolutely bars their advancement in the relevant community." (emphasis added)); id. at 844-45 (holding that because "[non-Native Hawaiian] students denied admission by Kamehameha Schools[, as "statistical data" demonstrates,] have ample and adequate alternative educational options," Kamehameha's admissions policy does not unnecessarily trammel rights or create an absolute bar (emphasis added)). That standard, however, conflicts with both the plain meaning of § 1981 and the basic premise that civil rights laws are "design[ed] to protect individuals of all races," McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 288 n. 19, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (emphasis added), and "not merely a group of individuals, or a body of persons according to their numbers," Mitchell v. United States, 313 U.S. 80, 97, 61 S.Ct. 873, 85 L.Ed. 1201 (1941). Since, by its own terms, § 1981 "explicitly applies to `all persons'" and not simply groups of individuals, McDonald, 427 U.S. at 287, 96 S.Ct. 2574 (quoting 42 U.S.C. § 1981(a)), the majority's holding that § 1981 protects groups instead of "all persons" contradicts the statute's plain meaning.[6] Indeed, as the Supreme Court has made clear, "[§] 1981, at a minimum, reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens," Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (emphasis added) (internal quotation marks omitted), and not simply, as the majority holds, racial groups qua racial groups. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir.2001) (holding that under Title VII "the ultimate issue is the reason[ ] for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace"); accord Connecticut v. Teal, 457 U.S. 440, 453-54, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) ("[Title VII's] principal focus . . . is the protection of the individual employee, rather than the protection of the minority group as a whole."); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (stating that an employer must "provide an equal opportunity for each applicant regardless of race, without regard to whether member's of the applicant's race are already proportionately represented in the workforce").
 
 
 177
 This bedrock principle has its origins in the history of the Fourteenth Amendment, from which § 1981 derives. The Equal Protection Clause provides in pertinent part that, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1 (emphasis added). Just as courts have read Title VII and—until now—§ 1981 to protect individual rights, courts have consistently held that the Equal Protection Clause "protect[s] persons, not groups." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Accordingly, the Supreme Court has required that "group classification[s] . . . be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." Id.; accord Mitchell, 313 U.S. at 97, 61 S.Ct. 873 ("It is the individual . . . who is entitled to the equal protection of the laws,—not merely a group of individuals. . . ."); Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) ("The rights established [by the Fourteenth Amendment] are personal rights."); Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 349-351, 59 S.Ct. 232, 83 L.Ed. 208 (1938) (similar); McCabe v. Atchison, Topeka, & Sante Fe Ry. Co., 235 U.S. 151, 161-62, 35 S.Ct. 69, 59 L.Ed. 169 (1914) (similar); J.E.B. v. Alabama, 511 U.S. 127, 152, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring in judgment) ("The neutral phrasing of the Equal Protection Clause, extending its guarantee to `any person,' reveals its concern with rights of individuals, not groups (though group disabilities are sometimes the mechanism by which the State violates the individual right in question).")
 
 
 178
 This principle is manifest in one of the cornerstones of our modern civil rights laws, Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. In Shelley, the Supreme Court rejected the argument that because courts could enforce racially restrictive covenants equally against both whites and African Americans, enforcing a racially restrictive covenant against African Americans in that case did not violate the Equal Protection Clause. Id. at 21-22, 68 S.Ct. 836. In so holding, Shelley reasoned that because "[t]he rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual . . . [i]t is . . . no answer to . . . say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color." Id. at 22, 68 S.Ct. 836. Indeed, "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." Id. Contrary to Shelley, the majority holds that equality can be achieved "through indiscriminate imposition of inequalities." Id.[7]
 
 
 179
 As there is no reason to depart from the plain meaning of § 1981 or the framework espoused in Shelley, I would follow Supreme Court precedent by considering the rights of individuals, not of groups. Consequently, I cannot concur in the majority's modification of the second Weber and Johnson factor.
 
 3. Attaining a Balance
 
 180
 Finally, the majority reworks the third Weber and Johnson factor, which requires that an affirmative action plan be "intended to attain a balanced work force, not to maintain one." Johnson, 480 U.S. at 639, 107 S.Ct. 1442; accord Weber, 443 U.S. at 208, 99 S.Ct. 2721 (holding an affirmative action "plan [should be] a temporary measure[,] . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance"). Though the Supreme Court has not required that all affirmative action programs contain an explicit end date, Johnson also holds that, "Express assurance that a program is only temporary may be necessary if the program actually sets aside positions according to specific numbers." 480 U.S. at 639-40, 107 S.Ct. 1442. Indeed, in such cases, a sunset provision is "necessary both to minimize the effect of the program on other employees, and to ensure that the plan's goals `[are] not being used simply to achieve and maintain . . . balance.'" Id. at 640, 107 S.Ct. 1442 (quoting Sheet Metal Workers, 478 U.S. at 477-78, 106 S.Ct. 3019); accord Taxman v. Bd. of Educ. of Twp. of Piscataway, 91 F.3d 1547, 1564 (3d Cir.1996) (en banc) ("[B]oth Weber and Johnson unequivocally provide that valid affirmative action plans are temporary measures that seek to attain, not maintain a permanent racial . . . balance." (internal quotation marks omitted)), cert. granted, 521 U.S. 1117, 117 S.Ct. 2506, 138 L.Ed.2d 1010 (1997), cert. dismissed, 522 U.S. 1010, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997).
 
 
 181
 Under the third factor, the majority properly recognizes that an affirmative action "admissions policy must do no more than is necessary to correct" a racial imbalance and must be "temporary." Maj. Op. at 842; accord id. at 845. Proclaiming that "[a]n explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid," Maj. Op. at 846, however, the majority completely ignores Johnson's suggestion that even a partial preference should be checked by an explicit sunset provision, by holding that Kamehameha's absolute preference need not contain a sunset provision at all, see Maj. Op. at 845 (holding that Kamehameha may use race as an exclusive admissions factor "so long as is necessary to remedy the current educational effects of past, private, and government-sponsored discrimination and of social and economic deprivation"); id. at 843 ("The goal [of Kamehameha's admissions policy] is to bring Native Hawaiian students into educational parity with other ethnic groups in Hawaii."); see also id. at 845 (noting that in the last "118 years, the Schools' admissions policy . . . has remained constant"). The majority thus not only rejects Johnson but also the Court's admonishment that "race-conscious admissions policies . . . however compelling their goals, are potentially so dangerous that they . . . must have reasonable durational limits." Grutter, 539 U.S. at 342, 123 S.Ct. 2325 (internal quotation marks and emphasis omitted); accord id. ("The requirement that all race-conscious admissions programs have a termination point assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." (internal quotation marks omitted)).
 
 
 182
 Far from placing a durational limit on Kamehameha's use of race as a dispositive admissions factor, the majority actually sanctions the use of race in perpetuity. For example, since few, if any, private parties will be able to correct "significant imbalances in educational achievement" in the entire "target population" through their own individual action, the majority's standard effectively issues private schools a license to engage in perpetual racial discrimination. Because such a limitless use of race in determining admissions contravenes precedent, the majority's retooling of Johnson and Weber's third factor is also unsound.
 
 
 183
 B. Applying the Majority's Standard to Kamehameha
 
 
 184
 Even if I were to agree with the majority's modifications to the Supreme Court's Title VII standard, I could not agree with its application of that standard in this case.
 
 
 185
 1. A Manifest Imbalance Presently Affecting the Target Population
 
 
 186
 Under the majority's modified first factor, "to justify a remedial racial preference, a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population" in the relevant community. Maj. Op. 842-43. I have explained above in Part I.A.1. why the majority's test is fundamentally flawed and conflicts with precedent. The majority's modifications—eliminating any focus on the schools' own population and any reliance on historical practices—relieves Kamehameha of the burden of demonstrating its policy is limited in scope and duration. For the reasons I explain in the next two sections, Kamehameha's affirmative action program fails both inquiries. Nevertheless, under the majority's modest thesis, Kamehameha's admissions policy arguably survives the first revised factor because it is clear that Native Hawaiians suffer from significant imbalances in educational achievement relative to most other ethnic groups in Hawaii.
 
 
 187
 2. Unnecessarily Trammel the Rights of the Non-Preferred Racial Group
 
 
 188
 Under the majority's second prong, "we ask whether, within the relevant community of Hawaii, the Kamehameha Schools' admissions policy unnecessarily trammels the rights of the non-preferred class, that is, students with no Hawaiian ancestry or creates an absolute bar to their advancement." Maj. Op. at 844. The majority holds that Kamehameha does not run afoul of this prong because: (1) "[t]he history of Native Hawaiians and of Kamehameha Schools has certain unique features that Congress has acknowledged"; (2) "nothing in the record suggests that educational opportunities in Hawaii are deficient for [non-Native Hawaiian] students"; (3) non-Native Hawaiians have no "legitimate, firmly rooted expectation of admission to the Schools"; and (4) "Kamehameha allows all students to apply for admission," though "once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry." Maj. Op. at 844-45. None of these explanations is sufficient to justify Kamehameha's admissions policy even under the revised standard.
 
 
 189
 For example, the majority's first finding is irrelevant. The mere fact that "Congress admitted that the United States was responsible, in part, for the overthrow of the Hawaiian monarchy" and that Congress has recognized "the challenge faced by Native Hawaiians in the educational arena" and has urged Kamehameha to "redouble its efforts to educate Native Hawaiian children," Maj. Op. at 845 (quoting H.R. REP. No. 107-63(I), at 333 (2001)), says absolutely nothing about whether Kamehameha's policy unnecessarily trammels rights or creates an absolute bar. Moreover, the statements the majority relies on also say nothing about whether Congress has ever been aware of Kamehameha's no non-Native Hawaiians policy, let alone endorsed it. Indeed, it is unreasonable to conclude, as the majority does, that by briefly endorsing the schools' larger educational goals in a committee report that does not even accompany a piece of legislation, Congress intended to sanction the requirements of an otherwise infirm affirmative action plan.[8]
 
 
 190
 The majority's second finding—that non-Native Hawaiians have other educational opportunities—also fails to justify the majority's holding that Kamehameha's admissions policy does not create an absolute bar or trammel the rights of the non-preferred race. In fact, as I have previously discussed, at pp. 863-66, supra, I believe that considering non-Native Hawaiians' alternatives in this way is unsound under prevailing civil rights case law. But even neglecting that fact, such reliance is particularly problematic here. Kamehameha has an illustrious network of alumni and a record of success that exceeds that of any other school in Hawaii. The tremendous trust corpus of the Bishop Foundation enables Kamehameha to offer this excellent education at a severely discounted price; as the majority notes, the cost of educating each student approaches $20,000 annually, but tuition at Kamehameha is less than 10% of this figure, and most students receive financial aid. See Maj. Op. at 831-32. No other school in Hawaii offers the same benefits at such low cost. Thus, the majority's second justification flies in the face of logic and cannot justify the majority's holding.
 
 
 191
 I find the majority's next finding—that because for the last "118 years, the Schools' admissions policy . . . has remained constant," non-Native Hawaiians have no "legitimate, firmly rooted expectation of admission to the Schools," Maj. Op. at 845 (citation omitted)—to be unavailing.[9] In other words, according to the majority, because non-Native Hawaiians have been discriminated against on the basis of their race for a long time, they have no cause of action under § 1981. This view is contrary to history and logic. Perhaps more than any other enactments in our history, the Fourteenth Amendment and the civil rights acts unsettled the expectations of an entire nation accustomed to judging people by their race. Surely the schools in Runyon would have found no defense by arguing that their exclusionary policies were open and notorious and that African-American students had "no expectation of admission to the Schools." Maj. Op. at 845. Advising non-Native Hawaiians that they have no possibility of admission to Kamehameha may settle their expectations, but it does not—for that reason—make the policy lawful.
 
 
 192
 Lastly, the majority's final justification for holding that Kamehameha's admissions policy does not unnecessarily trammel rights or create an absolute bar is absolutely wrong. The majority begins by noting that "[t]he Kamehameha Schools allow all students to apply for admission. But once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry." Maj. Op. at 844; accord id. at 845-46 (noting, "if qualified students with Native Hawaiian ancestry do not apply to the School in sufficient numbers to fill the spots available, as happened in one recent year, the Schools' policy is to open admissions to any qualified candidate." (footnote omitted) (emphasis added)). The majority then notes, in a bit of an understatement, that, "[b]ecause the pool of qualified potential students with Native Hawaiian blood greatly outnumbers the available slots at the Schools, non-Native Hawaiians generally are not admitted." Id. at 844. Highlighting the understated nature of its conclusion, the majority then proceeds to drop a footnote explaining that its euphemistic phrase "generally are not admitted" means that, from 1962 until 2002, Kamehameha admitted exactly one student who was not of Native Hawaiian descent. Id. at 844 n.10.
 
 
 193
 Proceeding as if its statement that Kamehameha generally does not admit non-Native Hawaiians proves that Kamehameha's policy is not an absolute bar, the majority entirely neglects to mention the circumstances surrounding the admission of that lone non-Native Hawaiian student. Because those circumstances speak volumes about Kamehameha's policy, however, they deserve an extended discussion.
 
 
 194
 In 1962, Kamehameha reversed its previous policy of allowing the children of faculty members to attend. Thereafter, the school did not admit a single non-Native Hawaiian student until 2002, when it admitted one non-Native Hawaiian student to its Maui campus. In response to a firestorm of protests following that decision, Kamehameha's trustees repeatedly apologized to the Native Hawaiian community, stated that the "situation" had "brought the problems with the admissions process into sharp focus," Members of Trs. of Kamehameha Sch., Kamehameha's Policy Will Remain, HONOLULU ADVERTISER, July 27, 2002, and acknowledged that they had "screwed up major," Rick Daysog, Angry Ohana Grills Trustees, HONOLULU STAR-BULLETIN, July 16, 2002. "As a result," the trustees "pledged to . . . carefully review [Kamehameha's] admissions process," Members of Bd. of Trs. of Kamehameha Sch., supra, presumably to prevent such a "situation" from happening again.
 
 
 195
 Far from an empty promise, Kamehameha promptly made several significant changes to its admission practices. First, it created the Ho'oulu Hawaiian Data Center to develop a Native Hawaiian registry and certify the Hawaiian ancestry of the schools' applicants; to be considered under the school's preference policy, an applicant's ancestry must now be verified by the data center.[10] Second, Kamehameha temporarily waived application fees for its Maui and Big Island campuses in order to induce more Native Hawaiians to apply for admission. Third, Kamehameha further increased the number of Native Hawaiians applying to its Big Island campus by allowing certain students, who had previously only been eligible for admission to its main campus in O'ahu, to apply for admission at the Big Island campus.[11] Fourth, Kamehameha also ceased its preliminary screening for O'ahu and Big Island applicants.
 
 
 196
 And fifth, Kamehameha ceased using a minimum scoring threshold to evaluate applicants. Since 1989, Kamehameha had required applicants to achieve a minimum composite score on an admissions test in order to be deemed "qualified applicants." Vicki Viotti, Kamehameha Standards Debated, HONOLULU ADVERTISER, Nov. 17, 2003, at 1B. Though that test was hardly an impediment to the school's preference policy—as 2002 marked the first time in four decades that the school had space to admit a non-Native Hawaiian student—it did at least provide an objective way to measure the number of qualified Native Hawaiian applicants. By eliminating that test, however, Kamehameha did away with that objective measure, while leaving in place "Kamehameha Schools' admissions policy . . . to give preference to applicants of Hawaiian ancestry to the extent permitted by law." Kamehameha Schools Admissions Office, Main Page, http://www.ksbe.edu/ admissions/mainpage.html (last visited Sep. 7, 2006). Thus, because that policy provides no objective guidance whatsoever, Kamehameha's decision leaves it free to restrict admission solely to Native Hawaiian children, and as the trustees promised, Kamehameha need never admit a non-Native Hawaiian applicant again. This description is not meant to criticize Kamehameha's noble mission to help Native Hawaiians receive a quality education, but only to demonstrate that its current policy—contrary to the majority's creative characterization—does pose an absolute bar to the admittance of any non-Native Hawaiian students. And, such bar violates section 1981.
 
 
 197
 3. Do No More Than Is Necessary to Correct a Manifest Imbalance
 
 
 198
 Similarly, I must dissent from the majority's analysis under its third prong. Under that prong, as modified by the majority, Kamehameha's "admissions policy must do no more than is necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry." Maj. Op. at 845. To hold that Kamehameha's admissions policy survives this factor, the majority asserts that Kamehameha's policy is both flexible and limited. Id. at 845-46. As for the former, the majority finds that Kamehameha's admissions policy "does not do more than is necessary" because that "policy is not fixed but changes as the capacity of the Schools' programs increases and as the well-being of the Native Hawaiian community rises." Maj. Op. at 845. The majority fails to provide any support for that conclusion, and that lack of support is far from surprising given that, as demonstrated above, Kamehameha has only made its race based admissions program more rigid, see supra at pp. 870-71.
 
 
 199
 The majority also finds that Kamehameha's admissions policy is "limited in duration" by the fact that "if qualified students with Native Hawaiian ancestry do not apply to the School in sufficient numbers to fill the spots available, as happened in one recent year, the Schools' policy is to open admissions to any qualified candidate" and the admissions policy will end when "the current educational effects of past, private and government-sponsored discrimination and of social and economic deprivation" end. Maj. Op. at 845 (footnote omitted). Because, as the majority candidly concedes, "there are many more qualified students of Hawaiian ancestry than there are available places at the Schools," id. at 832, and Kamehemeha altered its admissions criteria in response to what "happened in one recent year," id. at 845, it is unclear whether Kamehameha will ever admit another non-Native Hawaiian student, let alone end its racially exclusive admissions policy. I cannot understand how Kamehameha's policy can reasonably be described as "limited in duration."[12]
 
 
 200
 As Kamehameha's own trustees put it, "[Our policy] must remain [in place] until Hawaiians are leading in scholastic achievement, until they are underrepresented in prisons and homeless shelters, until their well-being is restored." Trs. of Kamehameha Sch., Kamehameha Schools' Policy Advocates Social Justice, HONOLULU ADVERTISER, Aug. 24, 2003. And, according to its website, "Kamehameha Schools' mission is to fulfill Pauahi's desire to create educational opportunities in perpetuity to improve the capability and well-being of people of Hawaiian ancestry." See Kamehameha Schools Admissions Office, Main Page, http://www.ksbe.edu/admissions/ mainpage.html (last visited Sep. 7, 2006). Because such a perpetual use of race in admissions has no limit, I cannot join the majority in holding that Kamehameha's admissions policy does no more than is necessary and therefore survives the modified third factor.
 
 
 201
 * * * * *
 
 
 202
 The Supreme Court has long warned that "[c]lassifications of [persons] solely on the basis of race . . . threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." Shaw v. Reno, 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (citations omitted). And as we have stated, "race-conscious programs must be designed to minimize—if not avoid—burdens upon nonculpable third parties." Coral Constr. Co. v. King County, 941 F.2d 910, 917 (9th Cir.1991). Nothing in the majority's opinion reassures me that Kamehameha has made that effort, and I must dissent from the majority's analysis.
 
 
 203
 II. CONGRESSIONAL EXEMPTION OF KAMEHAMEHA FROM § 1981
 
 
 204
 As an additional justification for its decision, the majority asserts that Kamehameha's policy does not violate § 1981 because Congress implicitly exempted racial preferences for Native Hawaiians from § 1981's coverage. The majority, joined to some extent by Judge Fletcher's concurrence, accomplishes this with three premises: First, the majority reasons that because § 1981 was enacted in 1870, prior to the acquisition of Hawaii, "Congress could not have had any conscious intention as to how [§ 1981] would apply in Hawaii." Maj. Op. at 847. Second, "Congress reenacted § 1981 in 1991." Id. at 849. Third, "Congress has passed [legislation] specifically affecting Native Hawaiians both before and after 1991," and to read these acts "consistently with the revised version of § 1981," we must read an exemption for Native Hawaiians into § 1981. Id. at 847-48. Indeed, according to the majority, this is "the most plausible reading of § 1981." Id. at 849.
 
 
 205
 Each of the majority's premises is either demonstrably wrong or utterly irrelevant. First, the majority's claim that "Congress could not have had any conscious intention as to how [§ 1981] would apply in Hawaii" is just plain wrong. Maj. Op. at 847. As the majority observes, when Congress first enacted § 1981 as part of the Civil Rights Act of 1870, the Hawaiian Islands were still a sovereign kingdom whose people remained outside the jurisdiction of the United States. The United States did not annex Hawaii until the 1890s. See Maj. Op. at 831, 847. It is clear, then, that Congress could not have initially intended either to cover or to exempt Native Hawaiians from § 1981's provisions. But nothing more can be gleaned from this fact. The majority reads a different point into this history: That we do not know how Congress intended § 1981 to apply in Hawaii. This is nonsensical and flies in the face of, among other things, § 1981 itself, the Hawaiian Statehood Act, the equal footing doctrine, and the Supremacy Clause.
 
 
 206
 Hawaii and its citizens have been subject to § 1981 since Hawaii became a territory because § 1981 applies to "[a]ll persons with the jurisdiction of the United States," including "every State and Territory." 42 U.S.C. § 1981(a) (2000). Congress reaffirmed this when Hawaii became a state in 1959 and joined the Union with all of the privileges and duties of all of the other states, that is, on an "equal footing," as if it had joined the Union at its founding. See Alaska v. United States, 545 U.S. 75, 125 S.Ct. 2137, 2143, 125 S.Ct. 2137, 162 L.Ed.2d 57 (2005); United States v. Texas, 339 U.S. 707, 716-20, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). As a new state, Hawaii and its citizens became subject to all laws of the United States, including § 1981. See U.S. CONST. art. VI, cl. 2 ("The Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby...."). This was made express in the Hawaiian Statehood Act, which provided that "the laws of the United States shall have the same force and effect within [Hawaii] as elsewhere within the United States." Pub.L. No. 86-3, § 15, 73 Stat. 11 (1959). See also Calkin v. Cocke, 55 U.S. 227, 235-36, 14 How. 227, 14 L.Ed. 398 (1852); Benner v. Porter, 50 U.S. 235, 243, 9 How. 235, 13 L.Ed. 119 (1850). In other words, § 1981 has long applied in Hawaii and on exactly the same terms as it applies elsewhere within the United States.
 
 
 207
 Second, building from its first faulty premise, the majority insists that § 1981 was "reenacted" in 1991. See Maj. Op. at 847 ("The 1991 amendments are . . . the only[ ] time since Hawaii became a state that Congress has reenacted § 1981." (emphasis added); id. at 847 ("Congress . . . reenacted § 1981 in 1991."); id. at 847-48 (". . . the pre-1991 statutory landscape . . . informs us about what Congress had in mind when it reenacted § 1981"); id. at 849 (". . . Congress reenacted § 1981 in 1991."); see also Conc. Op. at 853 ("In 1991, Congress revised and reenacted § 1981 . . ."); id. at 854 ("When Congress reenacted § 1981 . . ."). It wasn't. Rather, § 1981 was amended in 1991 by adding two provisions; not one word of § 1981's original text was touched by those amendments. Indeed, every word that Congress wrote in 1870 and that was codified in 1874-and was there in 1898 when Hawaii was annexed and in 1959 when Hawaii became a state—is still there.
 
 
 208
 In 1991, Congress amended § 1981 in two respects: It codified the Court's holding in Runyon that § 1981 applies to discrimination by private actors, see 42 U.S.C. § 1981(c), and it statutorily overruled the Court's holding in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that § 1981 does not extend to post-contract-formation conduct, such as the imposition of discriminatory working conditions, see 42 U.S.C. § 1981(b).[13] See also Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) ("In 1991, . . . Congress responded to Patterson by adding a new subsection to § 1981 that defines the term `make and enforce contracts' to include the `termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"); H.R. REP. No. 102-40, 102d Cong., 1st Sess., pt. II, at 37 (1991), U.S.Code Cong. & Admin.News 1991, pp. 549, 730-31 ("[Subsection (b)] overrules Patterson by adding a new subsection to Section 1981 . . . . [Subsection (c)] is intended to codify Runyon v. McCrary."). The majority does not argue that either of those amendments exempted Native Hawaiians, and the 1991 Amendments did not alter subsection (a) (except to add the "(a)" and the heading), which continues to state that the protections of § 1981 apply to "[a]ll persons within the jurisdiction of the United States." There is absolutely no indication in the 1991 amendments or their legislative history that Congress intended to exempt racial preferences for Native Hawaiians from § 1981's broad coverage.[14]
 
 
 209
 Third, the majority points to a variety of other statutes that Congress passed before and after 1991 which favor Native Hawaiians. See Maj. Op. at 847-49; see also Conc. Op. at 853-55. It is beyond dispute that Congress has enacted numerous statutes providing separate benefit programs for Native Hawaiians, but nothing in those acts says anything about § 1981, much less exempts Native Hawaiians from its coverage. See, e.g., Hawaiian Homes Commission Act § 1 et seq., 42 Stat. 108 (1920) (setting aside approximately 200,000 acres and establishing a program of loans and long-term leases for the benefit of Native Hawaiians); Department of Defense Appropriations Act, Pub.L. No. 103-335, 108 Stat. 2599, 2652 (1994) ("In entering into contracts with private entities to carry out environmental restoration and remediation of Kaho`olawe Island ... the Secretary of the Navy shall ... give especial preference to businesses owned by Native Hawaiians ...."); Native Hawaiian Education Act, 20 U.S.C. § 7512(13) et seq. (2002) (establishing programs to facilitate the education of Native Hawaiians and asserting a "political relationship between the United States and the Native Hawaiian people"); Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 et seq. (2002) (extending protection to American Indian and Native Hawaiian burial sites); Native Hawaiian Health Care Improvement Act of 1992, 42 U.S.C. § 11701(17) et seq. (1992) (creating a number of programs aimed at improving health care for Native Hawaiians and stating, "[t]he authority of the Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawaii"); Hawaiian Homelands Homeownership Act of 2000, Pub.L. No. 106-569, §§ 511-514, 114 Stat. 2944, 2966-67, 2990 (2000) (providing governmental loan guarantees "to Native Hawaiian families who otherwise could not acquire housing financing"); National Historic Preservation Act, 16 U.S.C. § 470-1(2) (1992) (stating that its purpose was to "provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations and in the administration of the national preservation program in partnership with States, Indian tribes, Native Hawaiians, and local governments"); National Museum of the American Indian Act, 20 U.S.C. § 80q-8 (1989) (providing for the return of Native Hawaiian human remains and funerary objects as well as the creation of a museum exclusively for the preservation and study of the history and artifacts of Native Americans); Drug Abuse Prevention, Treatment and Rehabilitation Act, 21 U.S.C. § 1177(d) (1983) (involving grant applications aimed at combating drug abuse and providing: "The Secretary shall encourage the submission of and give special consideration to applications under this section to programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, and families of drug abusers."); Native American Languages Act, 25 U.S.C. §§ 2901-06 (1990) (including Native Hawaiian languages in the ambit of Native American languages accorded statutory protection); Workforce Investment Act of 1998, 29 U.S.C. § 2911(a) (1998) ("The purpose of this section is to support employment and training activities for Indian, Alaska Native, and Native Hawaiian individuals"); American Indian Religious Freedom Act, 42 U.S.C. § 1996 (1978) ("[I]t shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."); Native American Programs Act of 1974, 42 U.S.C. §§ 2991-92, 2991a (1975) (including Native Hawaiians in a variety of Native American financial and cultural benefit programs: "The purpose of this subchapter is to promote the goal of economic and social self-sufficiency for American Indians, Native Hawaiians, other Native American Pacific Islanders (including American Samoan Natives), and Alaska Natives."); Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act, 42 U.S.C. § 4577(c)(4) (1983) (giving preference to grant applications aimed at combating drug abuse: "The Secretary shall encourage the submission of and give special consideration to applications under this section for programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, public inebriates, and families of alcoholics."); 20 U.S.C. § 4441 (1986) (providing funding for Native Hawaiian and Alaska Native arts and cultural development); Older Americans Act of 1965, 42 U.S.C. § 3001 et seq., 45 C.F.R. § 1328.1 (1988) (establishing a "program . . . to meet the unique needs and circumstances of Older Hawaiian Natives").
 
 
 210
 The scope of those enactments further underscores the fact that they could not have created a Native Hawaiian exemption from § 1981. Take, for example, the Hawkins-Stafford Amendments which both the majority and the concurrence point to as evidence that Congress approved and exempted Kamehameha's admissions policy. Maj. Op. at 848-49; Conc. Op. at 854. Those Amendments direct the Secretary of Health and Human Services to "make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." Pub.L. No. 100-297, tit. IV, § 4005(a), 102 Stat. 360 (1988). A directive to give Kamehameha a grant for a demonstration program does not create an exemption from generally applicable civil rights laws.[15] Furthermore, nothing in Stafford-Hawkins would be inconsistent with enforcement of § 1981 in this case. In fact, it could not be since Congress repealed the demonstration grant program before the sunset provision took effect, Pub.L. No. 103-382, tit. III, § 363, 108 Stat. 3975 (1994), and a current version of the act only mentions Kamehameha in the findings of fact. 20 U.S.C. § 7512(16) (2002).
 
 
 211
 Judge Fletcher goes a step farther than the majority, arguing that the Hawkins-Stafford Amendments and the Public Health Service Act "specifically directed Kamehameha Schools to do precisely what plaintiffs in this case say is forbidden by § 1981." Conc. Op. at 854. I cannot see how "`mak[ing] grants to [Kamehameha] for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students'" or "`provid[ing] funds to [Kamehameha] for the purpose of providing scholarship assistance' to eligible Native Hawaiian students" constitutes a specific instruction from Congress to Kamehameha to apply a racially exclusive admissions policy. See Conc. Op. at 854 (quoting Pub.L. No. 100-297, tit. IV, § 4005(a), 102 Stat. at 360 (formerly codified at 20 U.S.C. § 4905(a)) (repealed 1994) and citing Act of Nov. 29, 1990, Pub.L. No. 101-644, § 401, 104 Stat. 4662, 4668 (codified as amended at 42 U.S.C. § 254s)).[16] Judge Fletcher's conclusion is especially baffling because Congress never even mentioned Kamehameha's admissions policy in either piece of legislation, including the legislative history; in fact, there is nothing in the congressional materials to even suggest that Congress knew that Kamehameha's admissions policy was racially exclusive, let alone that Congress endorsed it.[17]
 
 
 212
 Additionally, the majority points to a House committee report that "favorably mentioned the Bishop Trust and exhorted the Schools to `redouble [their] efforts to provide for Native Hawaiians.'" Maj. Op. at 849 (quoting H.R. REP. No. 107-63(I), at 333). A committee report, however, says nothing about how Congress as a whole views Kamehameha's admission policy. This particular report is of no legislative value whatsoever because it does not even accompany an act; in other words, the committee's resolution does not even aspire to be legislative history. Furthermore, a committee's mere exhortation that Kamehameha should "redouble[its] efforts to provide for Native Hawaiians," id., does not, as the majority's reasoning would have it, equal legislation, duly enacted, that "Kamehameha may continue to provide for Native Hawaiians, in violation of existing civil rights laws, if necessary." In fact, there is absolutely no evidence that either house of Congress, or even any subset of its membership, knew about—let alone approved of—Kamehameha's absolute ban on non-Native Hawaiian students. Thus, the Hawkins-Stafford Amendments and the House committee report do not operate as some kind of estoppel against applying generally applicable civil rights laws to Native Hawaiians generally or to Kamehameha in particular.
 
 
 213
 Finally, from this thin record, the majority concludes that "the most plausible" way to harmonize these acts with the "reenactment" of § 1981 is to infer that "Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld." Maj. Op. at 849. Mere recitation of the conclusion should remind us of Justice Jackson's "restricted railroad ticket, good for this day and train only." Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Jackson, J., dissenting). In any event, there is no need to harmonize these statutes because there is no inconsistency. A straightforward reading of § 1981 does not render any other legislation non-sensical, void, or superfluous. The fact that Congress has passed some measures promoting Native Hawaiian education says nothing about whether Congress intended to exempt Native Hawaiian schools from § 1981; there is no legislative conflict to reconcile.[18] See Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").
 
 
 214
 Unfortunately, the majority's reasoning reaches far beyond Kamehameha, and in finding that Native Hawaiians preferences are exempt from § 1981, the majority holds that by amending that statute in 1991, Congress narrowed the scope of one of our oldest and most enduring civil rights statutes. See Maj. Op. at 847-49 (using the enactments outlined above to "interpret[] the scope of § 1981"). Moreover, the majority's focus on what Congress may have been thinking ignores what Congress actually did: It passed § 1981, a non-discrimination law of general applicability. Section 1981, on its face, clearly does not create any exemptions for Native Hawaiians; thus, whether or not Congress meant to create such an exemption—and again, there is absolutely no indication that it intended to do so—it certainly did not create such an exception. Cf. Williams v. Babbitt, 115 F.3d 657, 660 (9th Cir.1997) ("Congress may well have thought that, by passing the [Reindeer Industry] Act, it was effectively precluding anyone other than natives from entering the reindeer business. Nevertheless, nothing in the Act actually prohibits non-natives from entering the Reindeer business ....").
 
 
 215
 To my mind, the disparate statutes favoring Native Hawaiians that the majority relies on demonstrate a different point altogether: That when Congress wishes to give Native Hawaiians special treatment, it knows how to do so—and it is not shy about it. Cf. Malabed v. N. Slope Borough, 335 F.3d 864, 872 (9th Cir.2003) ("The existence of express preference programs created by Congress supports our conclusion.... [T]hey show that when Congress wants to authorize or require Native [American] hiring preferences, it knows how to do so."); Dawavendewa v. Salt River Project Agric. Improvement & Power Dist., 154 F.3d 1117, 1123 (9th Cir. 1998) ("The fact that Congress now requires a narrowly defined set of contracts to honor local tribal preference policies not only fails to support the argument that it intended to accomplish that same objective in 1964 when passing Title VII, but it suggests quite the opposite proposition. It shows us that when Congress wishes to allow tribal preferences, it adopts an appropriate amendment to the applicable statute."); Williams, 115 F.3d at 661 ("[T]he total and perpetual exclusion of a majority of the population ... from a particular enterprise is the kind of significant feature we would normally expect Congress to spell out if that were its intent."). Nothing in the statutory language or legislative history of § 1981 even hints that Congress wanted to exempt Native Hawaiian preferences from its provisions. Finding an exemption here is beyond any accepted method of statutory interpretation.[19]
 
 
 216
 If Congress wishes to exempt preferences for Native Hawaiians from § 1981, it may do so. Until then, however, we ought to apply the law as written. And as written, § 1981 clearly encompasses Kamehameha's racially exclusive admissions policy.
 
 III. NATIVE HAWAIIANS, MANCARI, AND THE SPECIAL RELATIONSHIP DOCTRINE
 
 217
 Judge Fletcher raises an interesting variation on the last argument. Like the majority, the concurrence concludes that racial preferences on behalf of Native Hawaiians are exempt from § 1981. However, Judge Fletcher arrives at this result via a slightly different route: First, he reasons that Native Hawaiian status is both a political and a racial classification. Conc. Op. at 850. He then suggests that, under the "special relationship" doctrine, Congress has given Native Hawaiians special benefits based on their political status. Id. at 856-57. From that, Judge Fletcher then postulates that because Congress has given Native Hawaiians special benefits, it could not have intended to prohibit private parties from doing the exact same thing. Id. at 852. Thus, according to the concurrence, § 1981, which prohibits racial preferences in private contracts, must be read to exempt preferences on behalf of Native Hawaiians. Id. at 856-57.
 
 
 218
 To establish his beginning premises, Judge Fletcher must rely on Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), which created the "special relationship" doctrine. In Mancari, the Supreme Court held that the Bureau of Indian Affairs's ("BIA") hiring preference for Native Americans did not constitute racial discrimination. 417 U.S. at 553-54, 94 S.Ct. 2474. Instead, the Court wrote that the preference was "not directed towards a `racial' group consisting of `Indians'; instead, it applies only to members of `federally recognized' tribes." Id. at 553 n. 24, 94 S.Ct. 2474. The Court concluded that this preference was therefore not a racial preference at all, but instead a political preference, and applied rational basis scrutiny. Id. Judge Fletcher would conclude that, under Mancari, Congress has the power to exempt private parties' racial preferences in favor of Native Hawaiians from the purview of § 1981. Conc. Op. at 853.
 
 
 219
 Before discussing the merits of the concurrence's reasoning, I note that Kamehameha did not make this argument on appeal, and it was not briefed by either party. Kamehameha did argue, as the majority concludes, that preferences in favor of Native Hawaiians are exempt from § 1981; however, it did not base its argument on the special trust doctrine espoused in Mancari. In fact, Kamehameha's brief does not even cite Mancari.[20] Because arguments not made in a party's appellate brief are waived, see Blanford v. Sacramento County, 406 F.3d 1110, 1114 n. 8 (9th Cir.2005); Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1164 (9th Cir.2003), it is improper for the court to even consider the argument raised by Judge Fletcher.
 
 
 220
 Nonetheless, turning to the merits, Judge Fletcher's argument puts more weight on Mancari than it can bear. As I explain in greater detail below, the exception in Mancari is an exceedingly narrow one, limited to preferences that are political not racial. Second, Mancari's special relationship works only in those cases where Congress has formally recognized the sovereignty of Native American tribes. Despite opportunity to do so, Congress has never formally recognized the sovereignty of Native Hawaiians. Third, even if Congress had recognized Native Hawaiians as a sovereign body, the special relationship doctrine applies only to preferences by the federal government or by the tribes themselves. It does not apply to private parties discriminating on the basis of tribal status; indeed, we have been quite clear that such private racial discrimination remains illegal.
 
 
 221
 First, Judge Fletcher agrees with the majority that "`Native Hawaiians' ... is a racial classification." Conc. Op. at 850; see Maj. Op. at 837 n. 9. But Judge Fletcher goes one step further, suggesting that "`Native Hawaiians' is not merely a racial classification," but "also a political classification." Id. at 850-51. If Judge Fletcher is correct, this case, from the outset, does not come within the special relationship doctrine of Morton v. Mancari because Mancari denied the very premise from which the concurring opinion proceeds. For instance, Mancari held that the BIA's Native American hiring preference "does not constitute `racial discrimination.'" 417 U.S. at 553, 94 S.Ct. 2474. "Indeed, it is not even a `racial' preference." Id. As the Court explained:
 
 
 222
 The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion. In the sense that there is no other group of people favored in this manner, the legal status of the BIA is truly sui generis.
 
 
 223
 417 U.S. at 554, 94 S.Ct. 2474 (citation omitted). Moreover, in concluding that the preference was political and not racial, the Court relied on the fact that the beneficiaries were members of federally recognized tribes:
 
 
 224
 The preference is not directed towards a `racial' group consisting of `Indians'; instead, it applies only to members of `federally recognized tribes.' This operates to exclude many individuals who are racially to be classified as `Indians.' In this sense, the preference is political rather than racial in nature.
 
 
 225
 Id. at 553 n. 24, 94 S.Ct. 2474 (internal quotation marks omitted). As the Supreme Court explained in Rice v. Cayetano, "[a]lthough the classification [in Mancari] had a racial component, the Court found it important that the preference was not directed towards a racial group consisting of Indians, but rather only to members of federally recognized tribes. In this sense, the Court held, the preference was political rather than racial in nature." 528 U.S. 495, 519-20, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (citation and internal quotation marks omitted).
 
 
 226
 Here, Judge Fletcher agrees that, whatever else Kamehameha's admissions policy may be, it is a racial classification. This fact places Kamehameha's policy outside the scope of Mancari's holding. The distinction is critical, because if a preference for Native Hawaiians were only political and not racial, then § 1981, by its own terms, would not apply. No exemption from § 1981 would be necessary. See Sagana v. Tenorio, 384 F.3d 731, 738 (9th Cir.2004) ("[T]he guarantee that `all persons' may enjoy the same rights that `white citizens' enjoy does not protect against discrimination on the basis of ... political affiliation."); Keating v. Carey, 706 F.2d 377, 384 (2d Cir.1983) ("In light of the Court's interpretation, the legislative history, and the express language of the statute, we hold that § 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation.").
 
 
 227
 Further, Mancari was premised on actual federal recognition of Native American tribes. See, e.g., 417 U.S. at 542, 94 S.Ct. 2474 (emphasizing the BIA's control over the "lives and destinies of the federally recognized Indian tribes") (emphasis added); id. at 551, 94 S.Ct. 2474 ("Resolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a `guardian-ward' status, to legislate on behalf of federally recognized Indian tribes.") (emphasis added); id. at 553 n. 24, 94 S.Ct. 2474 ("The preference is not directed towards a `racial' group consisting of `Indians'; instead, it applies only to members of `federally recognized' tribes.") (emphasis added); see also Rice, 528 U.S. at 519-20, 120 S.Ct. 1044.
 
 
 228
 Native Hawaiians have never been accorded formal recognition as a Native American tribe,[21] and while the "special trust relationship" between Congress and Native Hawaiians bears many similarities to the relationship between Congress and Native American tribes, the two relationships are not identical. And, as we recently acknowledged, "absent federal recognition, tribes do not enjoy the same status, rights, and privileges accorded federally recognized tribes." Kahawaiolaa v. Norton, 386 F.3d 1271, 1273 n. 1 (9th Cir. 2004). In fact, Congress has passed many statutes benefitting Native American tribes that do not include Native Hawaiians, or which distinguish them from Native American tribes. See, e.g., Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 et seq. (2000) (defining an "Indian" as "a person who is a member of [a federally recognized] Indian tribe"); 25 U.S.C. § 3001(9), (10) (2000) (defining Native American as "of, or relating to, a tribe, people, or culture that is indigenous to the United States" and Native Hawaiian, by contrast, as "any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii."); see also Kahawaiolaa, 386 F.3d at 1282 ("[F]ederal benefits and entitlements for native Hawaiians [are] different from [those] afforded federally recognized Indian tribes ...."); id. ("Congress, because of the unique history of Hawaii, has excluded [Native Hawaiians] from some statutes ...."); id. ("[M]any statutes distinguish between native Hawaiians and members of Indian tribes.").
 
 
 229
 We cannot usurp Congress's power to grant or not grant formal recognition to Native Hawaiians by simply declaring that the "comparable" status of Native Hawaiians, 20 U.S.C. § 7512(12)(D), gives them tribal status. Congress has created a discrete process for recognizing Indian tribes as tribes. See Indian Reorganization Act, 25 U.S.C. § 461 et seq.; see also 25 C.F.R. § 83.1 et seq. (1994) (Department of Interior regulations). Formal recognition as a tribe comes with a bundle of privileges, including self-government, tribal courts, control of Indian lands, and the power to tax. See, e.g., Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). None of these privileges have yet been afforded to Native Hawaiians, a judgment we recently upheld in Kahawaiolaa v. Norton. As we concluded there, "in the end, we must commit this question to Congress to apply its wisdom in deciding whether or not native Hawaiians should be included among those eligible to apply for federal tribal recognition." 386 F.3d at 1283.[22]
 
 
 230
 Finally, even if Congress had formally recognized Native Hawaiians, Mancari's special status doctrine would still not benefit Kamehameha because that doctrine does not apply to private parties. Mancari approved a Native American hiring preference adopted by the BIA because of the tribes' capacity as "quasi-sovereign[s]." Mancari, 417 U.S. at 554, 94 S.Ct. 2474; see also Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987); Fisher v. Dist. Ct., 424 U.S. 382, 390-91, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976). The "special relationship" recognized in Mancari was a sovereign-to-sovereign relationship that Congress has the power to regulate by virtue of the Indian Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, and the Treaty Clause, id. art. II, § 2, cl. 2, which "has often been the source of the Government's power to deal with the Indian tribes." Mancari, 417 U.S. at 552, 94 S.Ct. 2474; see also United States v. Lara, 541 U.S. 193, 200, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004). Thus, private parties may not seek refuge in Mancari's special relationship doctrine. Kamehameha—despite the strong loyalty of Native Hawaiians—is a private school established by a private trust, and not a recognized means of Native Hawaiian self-government.
 
 
 231
 Judge Fletcher's concurrence misses this point entirely when it asserts that "Congress may, if it wishes, permit Kamehameha Schools to give preferential admission treatment to Native Hawaiians." Conc. Op. at 853.[23] Judge Fletcher does not cite a single case where a court has upheld a private preference for Native American tribal members under the special relationship doctrine. In fact, we have soundly rejected exactly that argument. In Dawavendewa v. Salt River Project Agricultural Improvement and Power District, 154 F.3d 1117 (9th Cir.1998), pursuant to an agreement with the Navajo Tribe, an Arizona corporation sought to discriminate in employment by favoring members of the Navajo Tribe. Dawavendewa, a member of the Hopi Tribe, filed a Title VII claim alleging national origin discrimination. The defendants argued that, based on Mancari, "preferences based on tribal affiliation are based on political affiliation rather than national origin and are thus outside the realm of Title VII." Id. at 1120. Citing "the unique interest the [BIA] had in employing Native Americans," that had led the Court to recognize a limited exception for Congress, we held that the plaintiff had alleged a violation of Title VII. Id. at 1120.
 
 
 232
 We have even rejected attempts to extend Mancari's exception to other governmental entities. In Malabed v. North Slope Borough, 335 F.3d 864 (9th Cir. 2003), a local government adopted an ordinance that gave an employment preference to Native Americans, defined as members of federally recognized Indian tribes. Plaintiffs challenged the ordinance under the equal protection guarantee of the Alaska Constitution. The Borough attempted to justify its ordinance by relying on Mancari. Citing Rice, we limited Mancari's political exception to Congress's dealings with federally recognized Native American tribes and invalidated the ordinance. See id. at 865 n. 5 ("Mancari held only that when Congress acts to fulfill its unique trust responsibilities toward Indian tribes, such legislation is not based on a suspect classification." (emphasis added)). Other courts have taken a similar approach. See, e.g., Tafoya v. City of Albuquerque, 751 F.Supp. 1527, 1530 (D.N.M.1990) ("As the Supreme Court so clearly stated in Morton, Congress' obligations to Indians are constitutionally based and unique. The City of Albuquerque does not have comparable power to treat members of federally recognized Indian tribes or pueblos or members of the Navajo Nation differently than other groups of Indians or non-Indians."); id. at 1531 ("The Albuquerque City Council has considerably less power than the United States Congress to pass law discriminating in favor of members of federally recognized Indian tribes and pueblos. In this respect, the rationale in Morton is inapplicable to this case."); see also Rice, 528 U.S. at 520, 522, 120 S.Ct. 1044 (refusing to extend Mancari to state elections privileging Native Hawaiians; "the elections for OHA trustee are elections of the State, not a separate quasi sovereign").
 
 
 233
 Mancari may not even extend to Native American preferences in hiring by other federal agencies. The Court's holding in Mancari relied on the fact that "the preference applies only to employment in the Indian service," an agency that the Court described as "sui generis." 417 U.S. at 554, 94 S.Ct. 2474. The Court specifically did not "consider the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations." Id.; see also Rice, 528 U.S. at 520, 120 S.Ct. 1044 (noting "that [Mancari] was confined to the authority of the BIA, an agency described as `sui generis'"); Dawavendewa, 154 F.3d at 1120 (similar). We have previously limited the scope of Mancari in this fashion. In Williams v. Babbitt, 115 F.3d 657 (9th Cir.1997), for example, we considered whether the Reindeer Industry Act limited ownership of reindeer to Native Alaskans and whether such a limitation would be constitutional. The Act's defenders attempted to justify it under the Court's holding in Mancari. We rejected this argument, holding that the power granted Congress under Mancari's exception was of a far narrower scope. See id. at 664 ("The preference at issue in Mancari only applied to the BIA, an agency created for the purpose of serving Indians."); id. at 664-65 ("[W]e can discern Mancari's scope by looking to the cases it cited as examples of permissible special treatment for Indians. Each case dealt with life in the immediate vicinity of Indian land." (citations omitted)); id. at 655 ("While Mancari is not necessarily limited to statutes that give special treatment to Indians on Indian land, we do read it as shielding only those statutes that affect uniquely Indian interests."); id. ("[W]e seriously doubt that Congress could give Indians a complete monopoly on the casino industry or on Space Shuttle contracts.").
 
 
 234
 In sum, Mancari does not support Judge Fletcher's claim that Kamehameha's admissions policy is justified because it is both a racial and political classification. Judge Fletcher's rationale would render Mancari unrecognizable. Indeed, as with the exclusive Native Hawaiian voting scheme rejected by the Supreme Court in Rice, if Kamehameha's racially exclusive admissions policy "were to be sustained under Mancari we would be required to accept some beginning premises not yet established in our case law.... These propositions would raise questions of considerable moment and difficulty." 528 U.S. at 518, 120 S.Ct. 1044.
 
 IV. CONCLUSION
 
 235
 As noble as Kamehameha's goals may be, I cannot reconcile its admissions preference—a racially exclusive policy that operates as a complete bar to all applicants who are not of the preferred race—with the Supreme Court's requirements for a valid affirmative action plan. I cannot reconcile Kamehameha's admissions policy with the plain commands of § 1981, nor can I find any evidence whatsoever that Congress exempted Kamehameha from § 1981 altogether. The majority exempts an organization with noble goals that seeks to remedy a significant problem in a community that is in great need, but it can do so only because the majority departs from clear principles and established precedent.
 
 
 236
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Rudebusch did not include the requirement that the "manifest imbalance" be present in a job category that was traditionally segregated in its statement of the Title VII test. See 313 F.3d at 520. However, all of the cases we cited in Rudebusch to support the manifest imbalance factor included the traditional segregated job category requirement in their statement of the test. See Johnson, 480 U.S. at 631, 107 S.Ct. 1442; Weber, 443 U.S. at 204, 99 S.Ct. 2721; Higgins v. City of Vallejo, 823 F.2d 351, 356 (9th Cir.1987). Rudebusch gives no indication that it intentionally excluded this aspect of the requirement, and the defendant did not argue that this requirement had not been met. Thus, I do not believe that Rudebusch loosened the requirement that a job category must be traditionally segregated before an affirmative action plan is permissible.
 
 
 [2]
 We have considered the validity of affirmative action plans in a wide variety of contexts, and we have always applied the same Title VII standardSee, e.g., Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 723, 725-26 (9th Cir.1992) (evaluating a police examination scoring regime designed "to promote a higher percentage of minority officers" under an unmodified Title VII standard); Higgins v. City of Vallejo, 823 F.2d 351, 356-58 (9th Cir.1987) (evaluating a fire department's affirmative action program under an unmodified Title VII standard); La Riviere v. EEOC, 682 F.2d 1275, 1278-80 (9th Cir.1982) (holding that affirmative action plans by public employers should be subjected to an unmodified Title VII standard, and evaluating a California Highway Patrol affirmative action program under that standard); see also Gilligan v. Dep't of Labor, 81 F.3d 835, 837 (9th Cir. 1996) (discussing an affirmative action program at the Department of Labor and stating that the test of its validity is an unmodified Title VII standard). Indeed, we have also ruled in multiple Title VII cases involving affirmative action practices at educational institutions, and we have never even suggested that conduct by such institutions might be subjected to a different standard. See, e.g., Rudebusch, 313 F.3d 506 (considering a university's equity pay adjustment under Title VII's standards for affirmative action programs); Cerrato v. S.F. Cmty. Coll. Dist., 26 F.3d 968 (9th Cir.1994) (affirming a district court judgment dismissing a claim, brought by a professor who was passed over for the position of dean, that challenged the district's affirmative action policy under an unmodified Title VII standard).
 
 
 [3]
 The majority's reference to the First Amendment roots of "educational autonomy,"see Maj. Op. at 841, is misleading since the Supreme Court has consistently rejected First Amendment interests as a justification for racial discrimination. See, e.g., Runyon, 427 U.S. at 176, 96 S.Ct. 2586 (holding that while, "it may be assumed that parents have a First Amendment right to send their children to educational institutions that promote" racial discrimination, "it does not follow that the practice of excluding racial minorities from such institutions is also protected by the same principle"); Norwood v. Harrison, 413 U.S. 455, 470, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) (holding, "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections"); see also Hishon v. King & Spalding, 467 U.S. 69, 78, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (noting that under the First Amendment, "[t]here is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union").
 
 
 [4]
 It is not entirely clear what constitutes the relevant community under the majority's new test, but it appears the majority means the state where the affirmative action program has been adoptedSee Maj. Op. at 842. For instance, in announcing its new test, the majority maintains that "the relevant population is the community as a whole," id., but when the majority applies that test, it appears that, "[t]he relevant community in this case is the state of Hawaii," id. at 843.
 
 
 [5]
 Whereas the majority justifies neither purge, the second modification is particularly puzzling given the majority's repeated suggestion that history is of particular significance in this caseSee, e.g., id. at 830-31 & n. 2 (providing detailed information on Hawaiian history to "set[ ] the stage for our more particular consideration of the educational status of Native Hawaiian children"); id. at 839 ("The question remains how best to adapt the Title VII employment framework to an educational context and to the unique historical circumstances of this case." (emphasis added)).
 
 
 [6]
 Recognizing that the majority's new standard conflicts with § 1981's plain text, Judge Fletcher suggests that "of all the federal statutes to which strict text-based rules of statutory construction might be applied, § 1981 is a particularly inappropriate candidate" because under a plain-text reading "§ 1981 should not be read to protect whites [sic] against private racial discrimination." Conc. Op. at 856. BecauseMcDonald departed from Judge Fletcher's plain-text reading of § 1981, he reasons that we should reject the plain text of § 1981 altogether and turn to unrelated, repealed legislation and the pronouncement of a single congressional committee to interpret § 1981. Id. at 856-57. What Judge Fletcher forgets, however, is that McDonald stands for exactly the opposite proposition, namely that "the language and history of § 1981" demonstrate that "§ 1981 is applicable to racial discrimination in private employment against white persons." 427 U.S. at 286-87, 96 S.Ct. 2574 (emphasis added). Indeed, applying the plain text of the statute, McDonald emphasized that, "the statute explicitly applies to `all persons', including white persons." Id. at 287, 96 S.Ct. 2574 (emphasis omitted); see also id. at 287-96, 96 S.Ct. 2574 (discussing the history of § 1981).
 
 
 [7]
 The majority's reasoning cannot be limited to the § 1981 context. Indeed, if equality can only be achieved through inequality, it is unclear why the majority's rationale would not apply with equal force to employment, housing, or public schools
 
 
 [8]
 Indeed, considered in total, the paragraph that the majority relies on provides remarkably little support for its position:
 The Committee has also eliminated [certain of] the Native Hawaiian specific programs formerly authorized. . . . The Committee's rationale for repealing these programs is the fact that similar assistance is available to all students, including Native Hawaiians, under [other federal] programs. . . . Unlike other indigenous populations, Native Hawaiians have a trust, established by the last Hawaiian princess, which exists solely to educate Native Hawaiian children. The Bishop Trust is currently one of the largest charitable trusts in the world, valued in excess of $ 10 billion, and holds approximately 8 percent of all land in the State of Hawaii as well as a 10 percent share of Goldman Sachs. The Committee urges the Trust to redouble its efforts to educate Native Hawaiian children. The Committee also believes that these children should be given the same opportunities afforded to all of our children under the programs authorized in this and other acts.
 H.R. REP. No. 107-63(I), at 333 (2001).
 
 
 [9]
 Moreover, the majority ignores whatJohnson actually said. The plaintiff in that case was eligible for promotion but he had to compete with seven other applicants who could have been promoted over him. 480 U.S. at 638, 107 S.Ct. 1442. Accordingly, he did not have a "firmly rooted expectation" in the position he was denied. Id. ("[P]etitioner had no absolute entitlement to the road dispatcher position. Seven of the applicants were classified as qualified and eligible, and the Agency Director was authorized to promote any of the seven. Thus, denial of the promotion unsettled no legitimate, firmly rooted expectation on the part of petitioner." (emphasis added)). Nowhere did Johnson hold, as the majority concludes, however, that knowledge of a long-standing discriminatory policy justifies discriminatory decisions made pursuant to that policy.
 
 
 [10]
 I note that in 2003, Kamehameha admitted a student to its seventh grade class whose application identified his maternal grandfather as Native Hawaiian. One week before school was set to begin, Kamehameha learned that the student's mother was adopted and probably lackedbiological Hawaiian ancestry. Kamehameha immediately rescinded the student's acceptance. Ultimately, Kamehameha settled the case and agreed to allow the student to complete his education at Kamehameha. See David Waite, Boy Sues Kamehameha, HONOLULU ADVERTISER, Aug. 19, 2003, at 1B; David Waite & Vicki Viotti, Kamehameha Settles Kaua'i Boy's Lawsuit, HONOLULU ADVERTISER, Nov. 29, 2003, at 1A; see also Vicki Viotti & Mike Gordon, Kamehameha Settlement OK'd, HONOLULU ADVERTISER, Dec. 5, 2003, at 1B (stating that the district court indicated it believed that, legally, the boy was Native Hawaiian).
 
 
 [11]
 Kamehameha's flagship campus on O'ahu receives approximately ten applications for every available opening, so reducing its applicant pool did not present the danger that the school would not receive enough qualified Native Hawaiian applicants
 
 
 [12]
 Moreover, Kamehameha's own admissions policy may help perpetuate that policy indefinitely. Because Kamehameha bases its admissions decisions heavily on an applicant's prior academic performance it selects the highest-performing Native Hawaiian students from the public school population, and that necessarily depresses that population's average performance in public schoolsSee Vicki Viotti, Kamehameha Standards Debated, HONOLULU ADVERTISER, Nov. 17, 2003, at 1B. By continually passing over the lower performers, the Native Hawaiian population will likely continue to underperform in public schools relative to its peers. If "preference [may] be given . . . for so long as is necessary to remedy the current educational effects," Maj Op. at 845, Kamehameha's policy has no reasonable end in sight.
 
 
 [13]
 Section 1981, as amended, now reads in its entirety:
 (a) Statement of equal rights
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 (b) "Make and enforce contracts" defined
 For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
 (c) Protection against impairment
 The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
 
 
 [14]
 Judge Fletcher argues that the 1991 amendments were critical because "[i]t was not until the 1991 amendments to § 1981 that Congress specified that it intend[ed] courts to apply the statute to substantive discrimination by private actors." Conc. Op. at 854. It is true that Congress made clear in what is now 42 U.S.C. § 1981(c) that § 1981(a) applies to private entities. But in enacting that provision, Congress merely codified the Court's holding inRunyon that § 1981 reached private conduct under the Thirteenth Amendment. See Runyon, 427 U.S. at 168 n. 8, 96 S.Ct. 2586; see also Jones v. Alfred H. Mayer Co., 392 U.S. 409, 423-24, 437, 440, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (so holding with respect to 42 U.S.C. § 1982). We never questioned, post-Runyon and pre-1991, that § 1981 reached private conduct. See, e.g., Evans v. McKay, 869 F.2d 1341, 1344 (9th Cir.1989) ("Section 1981 prohibits private racial discrimination against white persons as well as against nonwhites." (emphasis added)); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1299 n. 4 (9th Cir.1982) ("[I]t is clear that Section 1981 extends to private conduct as well as state action....").
 
 
 [15]
 Whether Congress appropriated money to Kamehameha has no bearing on whether it thought that Kamehameha was in compliance with a wholly unrelated statute. It is easy to generate examples which clearly illustrate this: Before 2003, professors at the University of Michigan received numerous federal grants from the National Institutes of Health and the National Science Foundation, but this did not indicate that either Congress or the President believed Michigan's admissions policy was constitutional; indeed, the Department of Justice filed amicus briefs inGratz and Grutter arguing just the opposite. Similarly, no one would argue that Congress, by granting federal aid or favorable tax treatment to certain corporations (such as Texaco), intended to grant those corporations exemptions from federal antidiscrimination laws, cf. Smith v. Texaco, Inc., 281 F.3d 477 (5th Cir.2002). Nor would anyone argue that Congress, by allocating funds to state or local police departments, somehow evinces an intent to exempt such departments from the purview of 42 U.S.C. § 1983. These examples clearly demonstrate both the absurdity and the danger inherent in using such unrelated statutes to draw broad conclusions about Congress's inner mind.
 
 
 [16]
 It is also worth noting, once again, that the Hawkins-Stafford Amendments have been repealed
 
 
 [17]
 Judge Fletcher also argues that, "[i]n order to hold for plaintiff in this case, we would have to conclude that, Congress intended [the 1991 amendments to § 1981] to invalidate,sub silentio, the recently enacted legislation that provided loans and scholarships exclusively to Native Hawaiians at Kamehameha Schools." Conc. Op. at 854. Because § 1981, as set out above, has absolutely nothing to do with legislation providing loans and scholarships to Native Hawaiians, that assertion is simply wrong.
 
 
 [18]
 The majority's reliance onRunyon in this instance is misplaced. See Maj. Op. at 847 ("In Runyon, for instance, the Court relied on Congress' enactment of the Civil Rights Act of 1964 and other civil rights legislation in concluding that Congress must have intended § 1981 to reach private acts of discrimination."). Runyon discussed the passage of the Equal Employment Opportunity Act of 1972 because, while considering that act, Congress specifically considered repealing § 1981 to the extent that it applied to racial discrimination by private employers. See 427 U.S. at 173-75, 96 S.Ct. 2586. The Runyon Court was considering whether § 1981 applied to private acts of racial discrimination, and that debate provided clear evidence that Congress believed that § 1981 applied to contracts between private parties. Runyon provides no support for inferring an exception for Native Hawaiians in § 1981 merely because Congress has "provide[d] specifically for their welfare in a number of different contexts." Maj. Op. at 848.
 
 
 [19]
 The majority's new statutory metaphysics raises far more questions than it answers: How many provisions favoring Native Hawaiians must Congress pass before we will imply an exemption to § 1981? Would one act favoring Native Hawaiians somehow establish a lower level of scrutiny for Native Hawaiian preferences, and a subsequent act completely exempt such preferences—or was the exemption granted in one fell swoop? How might Congress go about removing this exemption; how many acts have to be repealed in order to repeal this exemption? If Congress had wanted Native Hawaiians to be covered by § 1981, must it have expresslyincluded them? Who else is exempted from § 1981 under the majority's logic?
 There is no end to this game.
 
 
 [20]
 In light of the narrowness of theMancari exception, which I discuss below, it is easy to see why Kamehameha decided that it was better off using its scarce brief space and oral argument time to pursue other arguments.
 
 
 [21]
 There is currently legislation in Congress— part of an ongoing effort—to extend formal recognition to Native HawaiiansSee S. 147, 109th Cong. (2005); H.R. 309, 109th Cong. (2005). Neither house has taken any action to date. Even if it were passed, however, there is cause to question whether such an act would be within Congress's constitutional power. See Rice, 528 U.S. at 519, 120 S.Ct. 1044 ("It is a matter of some dispute ... whether Congress may treat the native Hawaiians as it does the Indian tribes."). I decline to decide this question here; thus, I will prospectively assume that Congress has the power to formally recognize Native Hawaiians and to treat them as any other federally recognized tribe.
 
 
 [22]
 Judge Fletcher's concurrence cites two cases decided afterMancari which, he argues, eliminated the requirement for federal recognition: United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), and Delaware Tribal Business Committee v. Weeks, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). See Conc. Op. at 850-51. I disagree with the characterization of these cases. The first case, John, for example, did not even involve a Mancari issue but concerned whether certain lands constituted "Indian country" for purpose of the Major Crimes Act. See 18 U.S.C. § 1151; see also John, 437 U.S. at 635, 647-50, 98 S.Ct. 2541. Moreover, because the tribe involved in John had been accorded federal recognition, reliance on that case to demonstrate that federal recognition is not necessary for the Mancari doctrine to apply is inapposite. Id. at 650, 98 S.Ct. 2541. Similarly, Judge Fletcher's reliance on Weeks is misplaced. In Weeks, the Supreme Court rejected an Equal Protection Clause challenge to Congress's decision not to include the descendants of members of a recognized tribe who had voluntarily renounced their status in exchange for United States citizenship from a compensation scheme that benefitted the descendants of tribal members who had renounced their tribal status. The opinion cites Mancari, but not for reasons important to the holding of either case. See 430 U.S. at 84, 85, 97 S.Ct. 911. Neither John nor Weeks modified Mancari's holding, either explicitly or implicitly.
 
 
 [23]
 Judge Fletcher has it backwards. He cites the same body of laws—the collection of different preferences for Native Hawaiians—as evidence that Congress both implicitly created a special relationship with Native Hawaiiansand implicitly exempted them from § 1981. But Judge Fletcher's analogy to Native Americans is flawed: Congress has expressly created a special relationship with Native Americans by formally recognizing the tribes.
 This makes a difference. The Tenth and Eleventh Circuits have held that Native American tribal entities are implicitly exempt from some suits under § 1981. But those courts reasoned that because tribes are expressly exempted from disparate impact suits under Title VII, see 42 U.S.C. § 2000e(b); id. § 2000e-2, plaintiffs may not circumvent Title VII's exemption by suing under § 1981. See Taylor v. Alabama Intertribal Council Title IV J.T.P.A., 261 F.3d 1032, 1034-35 (11th Cir. 2001); Wardle v. Ute Indian Tribe, 623 F.2d 670, 672 (10th Cir.1980). Unlike the tribes, Native Hawaiians are not expressly exempted from Title VII, although there may be reason to wonder whether the majority's opinion implicitly exempts them.
 
 
 
 237
 RYMER, Circuit Judge, with whom KOZINSKI, O'SCANNLAIN, TALLMAN and CALLAHAN, Circuit Judges, join, dissenting:
 
 
 238
 This is altogether infelicitous.
 
 
 239
 On the one hand, the Kamehameha Schools is a well-recognized, widely-acclaimed private school, established before Hawaii became a state, whose primary mission has been to educate Native Hawaiian students in a culturally sensitive, challenging way. It receives no federal funds and does not operate for profit. Its purpose of providing meaningful access to educational opportunity is intuitively salutary. On the other hand, the admissions policy of the Kamehameha Schools prefers students of Native Hawaiian ancestry in such a way that, as a practical matter, non-Native Hawaiian students are precluded.
 
 
 240
 The question is whether Kamehameha's admissions policy violates 42 U.S.C. § 1981. Section 1981 was originally enacted as part of the 1866 Civil Rights Act, and confers on "[a]ll persons . . . the same right in every State . . . to make and enforce contracts as is enjoyed by white citizens. . . ."
 
 
 241
 We do not write on a clean slate, otherwise I would question how a statute that accords to all persons the same right to contract as is enjoyed by white citizens can mean the same right to contract as is enjoyed by Native Hawaiians. Yet it was held long ago that § 1981 applies to persons of any race, McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), and more recently, that Native Hawaiian ancestry can be a proxy for race, Rice v. Cayetano, 528 U.S. 495, 514, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).[1] Likewise, I would have difficulty understanding how § 1981 applies to a purely private, philanthropically-endowed, non-profit educational institution. However, it was also held long ago that § 1981 applies to private transactions, Tillman v. Wheaton-Haven Recreation Assn., 410 U.S. 431, 440, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), including to contracts for educational services,[2] Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).[3] But see Jones v. Alfred H. Mayer Co., 392 U.S. 409, 449-76, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (Harlan, J., dissenting from application of the similarly-worded 42 U.S.C. § 1982 to private discrimination in the sale or rental of property); Runyon, 427 U.S. at 192-214, 96 S.Ct. 2586 (White, J., dissenting). Finally, because education is the greatest inheritance of all, I have difficulty understanding what business it is of the federal government to tell a Native Hawaiian that she can't choose to help other Native Hawaiians whom she believes particularly need it.
 
 
 242
 This said, I am not persuaded that precedent allows the Kamehameha Schools to justify its preferential admissions policy on the footing that the policy redresses past societal discrimination against Native Hawaiians. The majority and dissenting opinions agree that we are guided by Title VII standards.[4] I agree with Judge Bybee that when, as here, a voluntary, private, affirmative action plan is at issue, the test is whether it eliminates a manifest racial imbalance, does not unnecessarily trammel the rights of non-preferred groups or create an absolute bar to their advancement, and makes adjustments that do no more than necessary to obtain a racial balance. United Steelworkers of America v. Weber, 443 U.S. 193, 208-09, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); see Rudebusch v. Hughes, 313 F.3d 506, 521 (9th Cir.2002) (breaking the Weber standard into these three factors).
 
 
 243
 Obviously, the Kamehameha Schools itself has never discriminated against Native Hawaiians; it is dedicated to serving them. Thus, the articulated justification for its race-based admissions policy is to remedy external discrimination, not internal imbalance. Even if a private educational enterprise has more wiggle room in defining its core mission in a race-conscious way than a private employer, to legitimate a race-based policy solely on account of discrimination by others is to put no bounds on it at all. To do so would render meaningless the factors that influenced the Supreme Court in Weber to approve a voluntary, private, affirmative action plan. 443 U.S. at 208-09, 99 S.Ct. 2721. A private entity's progress toward achieving "balance" cannot realistically be assessed if measured against society as a whole rather than its own work force or its own student body. But, even if a private party should be able to assume a public responsibility for remediation of past societal discrimination, the acceptable goal of a race-conscious admissions policy for a public educational institution is to achieve a diverse student body. Grutter, 539 U.S. at 325, 123 S.Ct. 2325 (endorsing the view that student body diversity is a compelling state interest that can justify the use of race in public university admissions). The purpose of Kamehameha Schools and its admissions policy is, of course, just the opposite. That, in a nutshell, is why I feel bound to reverse.
 
 
 244
 Beyond this, I agree with Judge Bybee that Congressional applause for programs that benefit Native Hawaiians neither connotes approval of an exclusionary admissions policy based on racial preference, nor grafts an exception onto § 1981. I also agree that Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), does not save the Kamehameha policy. Mancari involved a federal employment preference for persons of tribal ancestry that the Court upheld against a Fifth Amendment challenge because tribes, which are federally-recognized, are a political, rather than a racial, classification. 417 U.S. at 553-55, 94 S.Ct. 2474. However, the Court has since declined to extend Mancari to an Hawaii statutory scheme that restricted voting for certain state officials to those of Native Hawaiian ancestry. Rice, 528 U.S. at 518-23, 120 S.Ct. 1044.
 
 
 245
 As no other basis appears for affirming, I would reverse.
 
 
 
 Notes:
 
 
 [1]
 See also Saint Francis College v. Al-Khazraji, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (holding that § 1981 protects against discrimination based on ancestry).
 
 
 [2]
 Neither party discusses whether the right to "contract" is implicated by the kind of subsidized educational opportunity offered by the Kamehameha SchoolsCf. Runyon, 427 U.S. at 172, 96 S.Ct. 2586 (noting that the private, commercially operated schools being sued there for excluding qualified children solely because they were black would have received payments for services rendered, and the prospective students would have received instruction in return for those payments).
 
 
 [3]
 The Court noted both points—that § 1981 applies to any race and to a contract for educational services—inGratz v. Bollinger, 539 U.S. 244, 276 n. 23, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (citing McDonald and Runyon with apparent approval).
 
 
 [4]
 See Patterson v. McLean Credit Union, 491 U.S. 164, 186-87, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (embracing Title VII framework in § 1981 case). But see Grutter v. Bollinger, 539 U.S. 306, 343, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (observing that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"), and Gratz, 539 U.S. at 276 n. 23, 123 S.Ct. 2411 (noting that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981").
 
 
 
 246
 KLEINFELD, Circuit Judge, with whom Judges KOZINSKI and O'SCANNLAIN, Circuit Judges, join, dissenting:
 
 
 247
 I agree in large part with Judge Bybee's dissent and join in Parts II and III. His analysis of the majority and concurring opinions is in my view correct.
 
 
 248
 I write separately because I do not agree with Judge Bybee's view that Title VII provides the standard of review in this case. Title VII prohibits discrimination in employment.[1] This case does not involve employment. Title VII has nothing to do with exclusion of students from schools because of race. Nor is there a need to mine Title VII for some sort of analogy.[2]
 
 
 249
 The recent U.S. Supreme Court decisions about affirmative action, Grutter[3] and Gratz,[4] also have nothing to do with this case. Those cases involved whether racial discrimination by public schools under affirmative action plans violated the Equal Protection Clause of the Fourteenth Amendment. This case does not involve a public school or state action, so Grutter, Gratz, and the Equal Protection Clause do not come into the analysis.
 
 
 250
 We are not free to treat Hawaiian ancestry as a political rather than racial designation under Morton v. Mancari[5] because the Supreme Court held in Rice v. Cayetano that Hawaiian ancestry is a "racial classification."[6] If Congress chooses to define persons of Native Hawaiian ancestry as Indians under 25 U.S.C. § 479 or some other provision, perhaps it can.[7] But it has not.
 
 
 251
 This case is considerably simpler. In practice, Kamehameha Schools excludes students who do not have Native Hawaiian ancestry. The Kamehameha Schools are admirable in many ways, and there are good historical and social reasons why reasonable people might want to follow just such a policy. But we are not free to make a social judgment about what is best for Hawaiians. We are stuck with a case that is before us in our capacity as judges and we have to follow the law.
 
 
 252
 The law we have to follow was laid down by the Supreme Court in Runyon v. McCrary.[8] Runyon holds that the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits a private school from denying admission to prospective students because of their race.[9] It might have been thought that Runyon prohibited discrimination only against black people, but we are not free to interpret it that way. In McDonald v. Santa Fe Trail Transportation, the Supreme Court decided that the statute construed in Runyon, 42 U.S.C. § 1981, protects whites as well as nonwhites from discrimination.[10] A fortiori it protects all the ethnic groups in Hawaii: blacks, Filipino-Americans, Japanese-Americans, American Samoans, Chinese-Americans, and all the others, regardless of their ancestry.
 
 
 253
 In my view, that is the end of the analysis. I might have preferred to avoid deciding this case, if some jurisdictional defect existed. But we do have jurisdiction. Employment law, Indian law, our admiration for Kamehameha Schools, and our sentiments about public policy are irrelevant.
 
 
 254
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 See 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.").
 
 
 [2]
 Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), speaks to both Title VII and 42 U.S.C. § 1981. Because Patterson was an employment case covered in part by each statute, it does not speak to exclusion from a private school by reason of race.
 
 
 [3]
 Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).
 
 
 [4]
 Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003).
 
 
 [5]
 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)
 
 
 [6]
 Rice v. Cayetano, 528 U.S. 495, 522, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).
 
 
 [7]
 See Rice v. Cayetano, 528 U.S. 495, 519, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).
 
 
 [8]
 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)
 
 
 [9]
 Runyon v. McCrary, 427 U.S. 160, 172-73, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).
 
 
 [10]
 McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
 
 
 KOZINSKI, Circuit Judge, dissenting:
 
 255
 I join all three of my dissenting colleagues. Judges Rymer, Kleinfeld and Bybee have catalogued eloquently the many reasons why neither the majority nor the concurrence reflects what the law is, or should be, and there's nothing I can add on that score.
 
 
 256
 I write only to point out that the issue we are called on to decide may be a problem of the schools' own making. Runyon v. McCrary, 427 U.S. 160, 172-73, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 295-96, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), prohibit private racial discrimination in the making and enforcing of contracts. The provision is implicated here because the schools charge tuition and must therefore enter into a contractual relationship with each student. I don't believe section 1981 would apply at all if the schools were run entirely as a philanthropic enterprise and allowed students to attend for free. In Runyon, "the racial exclusion practiced by the [schools] amount[ed] to a classic violation of § 1981," because "[t]he parents ... sought to enter into contractual relationships with [the schools] for educational services." 427 U.S. at 172, 96 S.Ct. 2586. The Court emphasized the commercial nature of the relationship: "Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." Id. I have found no case where section 1981 has been applied to a charity. Were the schools to forego charging tuition, their relationship to their students would probably not be deemed "contractual" as that term is used in section 1981 and Runyon.
 
 
 257
 Being able to charge tuition is, of course, not inconsequential. For most private schools it is a make-or-break proposition. But it may not be so for the Kamehameha Schools, which were set up primarily as eleemosynary institutions. The tuition they charge reflects only a small fraction of their operating costs and, even then, most students pay a reduced tuition, or no tuition at all. See maj. op. at 831-32. The schools' substantial endowment may enable them to continue operating without charging any tuition for a very long time— perhaps indefinitely.
 
 
 258
 Given the scores of pages we have written on both sides of this issue, it should be clear that the question is close and ours may not be the last word. Given the passions this case has aroused, see maj. op. at 835 n. 6, it's worth noting that what's really at stake may not be the operation of the Kamehameha Schools along their traditional (preferential) model, but merely a few million dollars a year the schools now get from their own students.